Fahy, Circuit Judge,
sitting by designation, delivered the opinion of the court:
This is an action against the United States for damages for alleged breach of a lease agreement entered into between plaintiffs and the United States through the General Serv *557 ices Administration. The factual situation may be summarized as follows. In 1952 the United States Government, acting through the General Services Administration, advertised for bids for the lease of property in New York City. Among those received was one from the plaintiffs offering the Paramount Hotel Building, then being used as a hotel, on an “as is” basis. The defendant could not lease the building “as is” because of appropriation problems that made it impossible for the Government to defray the cost of alterations necessary to convert the building to the use desired. In a note appended to their bid, however, plaintiffs stated that they were willing to negotiate a lease containing a provision for plaintiffs at their expense to make the changes required.
The bids were opened in October 1952. Thereafter representatives of the plaintiffs and of the defendant engaged in negotiations which culminated in the execution in September 1953 of an agreement denominated a “lease.” This instrument provided that “the Lessor hereby leases to the Government” a major portion of the Paramount Hotel, occupancy to be for five years, with two options for renewals of five years each, “following completion of repairs and alterations and renovations as itemized in Paragraphs 17 and 20.” These paragraphs read in pertinent part:
17 (a) * * * Preliminary floor plans and specifications will be furnished by the Government. Upon Lessor’s receipt of the preliminary plans and specifications and executed copy of this lease, the Lessor shall immediately employ, subject to approval of the Government, an architect * * *, to prepare the necessary detailed plans and specifications for the remodeling of the premises as required by the Government and obtain all required permits for the remodeling and certificate of occupancy as an office building * * *. Before Lessor proceeds with the work of remodeling the premises, the architect’s detailed plans and specifications shall be submitted to the Government for review and final approval.
17 (b) All costs, obligations or expenses (hereinafter called “construction costs”) which are attributable to proper prosecution of the remodeling referred to in Paragraph 17 (a) hereof (regardless of whether or not such “construction costs” are pursuant to a written contract) shall be paid by the Government to the Lessors as *558 herein provided. By way of illustration, such, “construction costs” shall include specifically but not exclusively, labor, material, insurance premiums, permits, taxes, * * * contractors’ and sub-contractors’ overhead and profits, architectural and engineering fees, interest upon monies borrowed to finance the cost of the alterations and renovations required under Paragraph 17 (a) above, and all other of the alterations and renovations * * *. Prior to incurring any “construction costs”, exclusive of architect’s fee, and after receipt of the architectural plans and specifications, _ Lessor shall * * * obtain from a minimum of four bidders a total bid on all the work to be accomplished under the architectural plans and specifications, with the Government reserving the right to name at least two of the bidders * * *. Upon receipt of the bids * * * Lessor shall submit same to the Government for approval * * *. If it shall appear that the “construction costs” will exceed Six Hundred Thousand Dollars ($600,000), then the Government, by mutual agreement with the Lessor, may modify all or such part of the plans and specifications as shall be necessary or desirable to reduce the total “construction costs”; provided, however, that nothing contained herein shall be construed to limit the total “construction costs” to Six Hundred Thousand Dollars ($600,000) if the Government, in the manner provided herein, does not elect to limit such costs to Six Hundred Thousand Dollars ($600,000), in which event, any such increase shall be made only with the consent of the Lessor, which consent shall not be unreasonably withheld * * *.
* * * * *
17 (d) At such time as the “construction costs” are ascertained and the building is ready for occupancy, * * * this lease shall be modified by Supplemental Agreement No. 1 in the form attached hereto as “Exhibit A”, which agreement shall provide for payment of the “construction costs” to the Lessor in one hundred and twenty (120) equal monthly installments * * *.
17 (e) In the event this lease shall be terminated for any reason whatsoever at any time during the term of this lease or any renewal thereof, the Government’s obligation to repay the “construction costs” shall not be modified, diminished, or in any other way altered or affected.
*559 20. During the continuance of this lease and at no expense to the Government the Lessor shall * * * comply with all applicable municipal ordinances, regulations and statutes relating to buildings and their equipment, and to make or have made such changes as may be required to bring such structure or equipment into conformity with existing codes * * *.
In addition paragraph 14 is material:
14. In performing any work herein required to be done by Lessor, the Lessor agrees to comply with all applicable State, Municipal and Local Laws and the rules, regulations and requirements of any departments and bureaus, and all local ordinances and regulations.
In accordance with paragraph IT (a), the defendant furnished preliminary floor plans and specifications. Plaintiffs employed architects who prepared the detailed plans and specifications. These, however, contained three items not included in the preliminary plans prepared by the defendant,, namely, a truck bay and fire alarm and sprinkler systems* required by New York City zoning ordinances. The truck bay called for extensive and expensive renovation to the superstructure of the building. In all the cost of the renovation as detailed in the architects’ plans would push the cost far above the $600,000 figure. The Government refused to approve the inclusion of the truck bay, fire alarm, and sprinkler items in the detailed plans. A controversy ensued as to who had the responsibility for these costly items. Plaintiffs contend that as these items were necessary to the úse of the building for office purposes the defendant must bear their cost as part of “construction costs”; the defendant contends that the September 1953 agreement contemplated that the defendant pay only for those changes it requested and that the plaintiffs, under paragraphs 14 and 20, were to pay for changes required by city ordinances but not requested for defendant’s use.
This controversy was unresolved by the parties and demonstrates the difficulty we find with the plaintiffs’ position. Their position is that the September 1953 agreement was a, completed, legally operative lease which called for performance by defendant, failing in which they are entitled to damages for its breach. Yet there were the above-mentioned *560 items of major importance unsettled by the agreement of September 1953. While it is true that in November 1952 defendant had furnished to plaintiffs an outline description of the alterations it would require, until these could be embodied in specific plans it could not be known what alterations were actually to be made and paid for by defendant. Neither party had investigated zoning requirements, which intervened to lift the costs very substantially. To the extent agreement had been reached it contemplated a cost ceiling far less than was possible under the architect’s detailed plans and specifications, which were never approved.
To find defendant responsible for breach of agreement in refusing to go forward when so much remained unsettled would require the court itself to write a major portion of the agreement. This it should not do. See Fremon v. W. A. Sheaffer Pen Co., 209 F. 2d 627 (8th Cir.); National Bank v. Louisville Trust Co., 67 F. 2d 97, 102 (6th Cir.); Bonk v. Vozajian, 128 Cal. App. 2d 155, 274 P. 2d 948; 1 Williston, Contracts § 45 (3d ed. 1957). Though denominated a lease, with words of demise,[1] the September 1953 agreement, in the situation we have explained, was not a final, enforceable lease or other agreement evidencing a meeting of the minds of the parties. Kerr Glass Mfg. Corp. v. Elizabeth Arden Sales Corp., 61 Cal. App. 2d 55, 141 P. 2d 938; See Mid-Continent Pet. Corp. v. Russell, 173 F. 2d 620 (10th Cir.); American Merchant Marine Ins. Co. v. Letton, 9 F. 2d 799 (2d Cir.).
Plaintiffs contend that defendant’s failure to approve the plans drawn by the architects or to propose modifications that would lower the costs to its satisfaction constituted breach of contract, relying upon Stevens v. Howard D. Johnson Co., 181 F. 2d 390 (4th Cir.). But here the parties neither had arrived at a final agreement as to the alterations to be made nor upon terms under which the law fixed responsibility upon defendant to prevent damages to plaintiff due to the failure of the parties to resolve the disagreement which arose. Moreover, defendant did make a proposal for modifying the alterations so as to bring the costs down to *561 $600,000. This was rejected by plaintiffs. In addition, it is not simply that the parties were nnable to agree as to who was obligated to pay for the truck bay and fire alarm and sprinkler systems, but we find no legal basis for holding that such an obligation had been placed by contract upon defendant. For defendant to refuse to go forward when the situation as it developed left so much unresolved by the negotiations was not so unreasonable as to constitute a breach of agreement on its part.
We have considered plaintiffs’ contention that they are entitled to recover on the theory that the United States through its representatives anticipatorily breached the lease on the ground that it was illegal and ultra vires in certain of its provisions, thus relieving plaintiffs of responsibility for further performance and entitling them to sue for breach of agreement. They cite Roehm v. Horst, 178 U. S. 1, and In re Mullings Clothing Corp., 238 Fed. 58 (2d Cir.), as well as other cases. We do not think this contention furnishes a basis for a decision favorable to plaintiffs; for though it be true that the representatives of the United States did at a certain point characterize provisions of the lease as illegal and ultra vires — a position not persisted in during the litigation — it is also true that the negotiations between the parties actually collapsed for other reasons and in the manner we have described.
Since there was no breach by defendant of an enforceable agreement plaintiffs must bear the costs which they expended in the process of trying to reach such an agreement. Defendant was also at considerable expense which it has not sought to recover.
The petition will be dismissed.
It is so ordered.
Heed, Justice {Bet.), sitting by designation; Labamobe, Judge; MaddeN, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
*562 1. Plaintiffs, Maxwell Abbell and Joseph J. Abbell, who are citizens of the United States and residents of the State of Illinois, are the owners of the premises known as the Paramount Hotel Building, 235 West 46th Street, New York, New York.
2. This action was brought to recover damages for the alleged breach of a lease covering the Paramount Hotel Building. In its answer the defendant has denied that a valid or binding lease agreement existed and that it breached any agreement. By stipulation approved by the commissioner of this court to whom the case was assigned, a hearing was held to determine the issue of liability, leaving for later determination the issue of damages in the event the defendant is found liable.
3. The Paramount Hotel is a 19-story brick and steel building of fireproof construction.
4. Early in the summer of 1952, the Internal Revenue Service of the Department of the Treasury, hereafter referred to as IRS, requested the General Services Administration, referred to hereafter as GSA, to obtain suitable office space in midtown Manhattan for the proposed consolidation of IRS activities. In July of that year GSA conducted a survey to ascertain whether suitable space was available. Before GSA had taken any other action to procure space, however, Messrs. William T. Carrigan, Jr., then a valuation engineer stationed in the New York office of IRS, and Louis Y. DeSantis, then Assistant. Chief of the Buildings and Surveys Division, Department of the Treasury, Washington, D. C., met in New York City and discussed with Mr. Bernard Greenbaum, a Chicago real estate broker, the fact that IRS was seeking office space in New York. After receiving that information, Mr. Greenbaum proposed to representatives of GSA in New York the availability of the Paramount Hotel Building. Greenbaum was informed that his suggestion would be considered but that GSA was not in a position to discuss the matter in detail. Thereafter, on August 12, 1952, a conference was held in the office of the Regional Director, GSA, in New York. That conference was attended by a number of representatives of GSA, IRS and the Department of the Treasury. At the con *563 ference, the requirements of IES were outlined and it was decided to advertise for space to fulfill IES needs. An invitation for bids was prepared and circulated by GSA to 741 real estate brokers and building owners. The advertisement for bids invited three alternative proposals, described as Bids A, B and C. The advertisement for Bid A invited proposals for a building large enough to provide offices for both the Eegional Commissioner and the District Director of IES. The advertisement for Bid B invited proposals for space required by the office of the Eegional Commissioner and his staff, and the advertisement for Bid C invited proposals for space required by the office of the District Director and his staff.
5. The invitation for bids recited:
The Federal Government desires to acquire by lease, space for office, storage and related uses, as indicated below, in buildings already constructed, or to be constructed, for a term of five (5) years commencing at the earliest practicable date, with options to renew for separate additional five-year terms thereafter upon ninety (90) days’ written notice to the Lessor, .to be indicated by bidder in the respective bids.
* * * * *
The instructions to bidders and general provisions which accompanied the invitation recited, among other things:
$ ‡ ‡ ‡
(5) (b) The Government reserves the right to'reject any or all bids and to waive any informality in bids received when such waiver is in the interest of the Government ; or to enter into negotiations with individual bidders ; or to solicit or consider other properties whether or not submitted in response to this advertisement or at the announced date of opening, as determined to be in the best interest of the Government.
*****
8 (b) If existing building(s) are offered, the Bidder shall so state in his Bid, and if not presently in compliance with the specifications herein set forth, the Bidder shall specify whether his annual Eent Bid includes the necessary alterations. Details of such alterations included in his Eent Bid shall be submitted for the Government’s approval before proceeding with the letting of contracts and execution of the alterations.
*****
*564 13. CONDITIONED BlPS: PROPOSALS CONTAINING CONDITIONS Other Than Those Imposed by the Government Contained Herein "Will Not Be Considered. Without limiting the generality of the foregoing, bidders’ attention is specifically invited to the fact that bids which contain proposals conditioned upon financing, accelerated amortization for tax purposes, or any conditions inimical to the best interests of the Government will not be considered.
*****
19. Laws, Taxes, Etc.: The proponent at his own expense must comply with all State, local laws, ordinances, building codes, rules and regulations, and statutes relating to office buildings, their occupancy and equipment requirements, and shall make or cause to be made such changes as may be required to bring such structures and/or their equipment into conformity with all State, local laws, ordinances, building codes, rules and regulations, and statutes; and shall pay all taxes, duties, or other charges levied or to be levied on the said premises, except gas, electric current and fuel.
$ * $ ‡ *
6. The bids were opened October 31, 1952. GSA received only 12 bids, one of which was submitted by the plaintiffs. No offer of space was made under Bid A by the plaintiffs, who under Bid B offered 19 floors of the hotel (exclusive of basement and subbasement) with a net usable space of 180, 405 sq. ft. at $1.74 per sq. ft., subject to certain conditions which provided that the rental quoted was based upon the Government’s performing at its own expense its own tenant changes, alterations and remodeling; and, provided that the changes made would not be in violation of local, state, and Federal rules, laws and ordinances. This bid also contained the following proviso:
# jN ❖ * *
The Government shall not be required to restore the premises at the expiration of its occupancy except as hereinafter stated. The Government shall have the right to effect tenant changes, alterations and remodeling without the prior consent of the Lessor; however, the Government shall not make any structural changes without the prior consent of Lessor and The Government shall file with the Lessor plans and specifications indicating such structural changes. In addition there *565 of, if the Lessor grants approval for structural changes, the Government shall upon making such changes, not do or perform any work which shall be in violation of any building codes or ordinances, local, County or State, regarding such structural changes. If any structural changes shall be made, the Government shall at the expiration of its occupancy restore the premises to the condition existing prior to said structural changes.
:B H* ❖ H* ❖
A note at the end thereof stated:
Note:
Bidder is willing to enter into negotiations for the lease of the space described in the foregoing Bid “B” upon conditions under which bidder will at its expense make the changes, alterations and remodeling required by the Government.
The plaintiff also submitted a proposal to rent a lesser amount of space under Bid C with substantially the same attached conditions.
7. Mr. Harvey F. Gibson was, during all times material herein, Chief, Beal Property Acquisition & Utilization Division, Public Buildings Service, General Services Administration, in the New York Regional office of that agency. He was a contracting officer. The above described bids were solicited by his office and returned to him. His assistant was Mr. Anthony Boemi, whose title was Chief of the Leasing Branch of Mr. Gibson’s division.
8. Shortly after the opening of bids, Mr. Greenbaum came to the New York office of GSA and was told that it would not be possible for GSA to lease the building “as is” because appropriation difficulties precluded GSA from making at Government expense the necessary alterations to render the hotel suitable for office use. Greenbaum was told that he should obtain and present to Mr. Gibson’s office a power of attorney if the owners desired to negotiate further in connection with the rental of the hotel. Greenbaum did obtain a power of attorney authorizing him to negotiate on behalf of the owners with GSA “* * * in regard to the leasing, remodeling, reconstruction and alteration of * * * HOTEL PARAMOUNT ; * * *” The power of attorney was signed by the plaintiffs, and dated November 6, 1952.
*566 9. On November 20, 1952, Mr. Greenbaum again came to New York and a conference was held in the GSA office between him and Mr. Gibson and Mr. Boemi of GSA, and Mr. DeSantis and Mr. Carrigan of Treasury. Mr. Greenbaum presented the power of. attorney referred to above. Mr. Carrigan brought to the conference an outline description of alterations of the Paramount Hotel required for occupancy by the District Commissioner’s office, Bureau of Internal Revenue. Mr. Carrigan and Mr. Greenbaum, each of whom had had substantial experience regarding construction and alteration costs, considered the cost of accomplishing the alterations. Greenbaum arrived at a figure of about $450,000 and Carrigan arrived at a figure of about $600,000 as the approximate cost of accomplishing the alterations covered by the outline description of alterations. Greenbaum stated at that meeting that any deal negotiated would have to return $1.74 per sq. ft. to the owners plus amortization and interest cost on any amount which the owners would be required to spend to accomplish the alterations required.
10. After the conference referred to in the preceding finding, a tabulation of all bids received was prepared by Mr. Boemi in which a basic proposed rental of 162,240 sq. ft. of space in the Paramount Hotel was shown at $1.74 per sq. ft., an estimated operating cost at $1.31 per sq. ft. was shown, as well as the cost of 46 cents per sq. ft. representing the cost of alterations, which were estimated at $600,000 to be amortized over 10 years at 41/2 percent interest. Under remarks on this tabulation the notation “Recommended for Commissioner’s Office” is shown.
11. On November 26, 1952, Mr. Gibson prepared and sent to the office of the District Commissioner, Internal Revenue Service, New York, over the signature of Gibson’s superior, Mr. Walter F. Downey, GSA Regional Director, a letter recommending acceptance of offers as to two buildings, one for the District Director’s office and that concerning the Paramount Hotel for the District Commissioner’s office. That letter transmitted the tabulation of bids received and reads in pertinent part as follows:
It is, therefore, the recommendation of this office that we accept the offers made to us on two existing buildings *567 as listed below. This recommendation was arrived at after a thorough study of the properties as far as location, accessibility to public transportation, layout of the space, date of occupancy and the overall cost to the Government.
The location recommended for the District Commissioner’s office is the Paramount Hotel situated at 235 West 46th Street between Seventh and Eighth Avenues. The owner can make available within approximately six months the entire building above the second floor (17 floors) containing a net rentable area of 162,240 square feet of space at an annual rental of $1.74 per square foot. GSA has estimated that it will cost $1.31 per square foot to operate and maintain this space. However, the owner has indicated his willingness to operate the building on a cost basis with such cost to be adjusted at the end of each year based on his actual expenditures. The owner has also agreed to perform all alterations provided the Government repays such cost which will be amortized over a period of 10 years at 4y2 percent interest, or in the event the space is vacated at the end of the first 5 years of the lease, the Government will then be required to pay any balance of the cost in a lump sum. Initial estimates of the alteration cost was placed at $600,000.00, however, Mr. Carrigan of the Bureau of Internal Keve-nue has indicated that a revision of his plans for this space should reduce the cost to approximately $400,000.00 by virtue of the fact that relocation of corridors on approximately 8 floors will not be necessary. The owner has also agreed to place individual air-conditioning units in all windows at an additional rental of 6‡ per square foot. Present Government regulations require adequate justification before air-conditioning can be installed in general-purpose space.
12. On November 28,1952, Mr. Gibson wrote a letter to the plaintiff in the following terms:
Under the terms of the Bid which you submitted in response to our recent advertisement you indicated that the Bid must be accepted within 30 calendar days from the date of the Bid opening (October 31, 1952).
In view of the fact that it is taking considerable length of time to make a thorough investigation of the properties in response to our advertisement, we hereby request that you grant us an additional 30 days for acceptance of your offer, or as many days as you are in a position to extend your proposal.
*568 Let us have your reply in duplicate so that we can attach it to the copies of the Bid which are on file in this office.
13. On December 5,1952, Bernard Greenbaum sent a letter to Mr. Gibson and this was enclosed as an attachment to a letter signed by the plaintiffs, bearing the same date, addressed to Mr. Gibson.
Greenbaum’s letter reads as follows:
Pursuant to my phone conversation with Mr. Boemi yesterday, enclosed find Extension Agreement, signed by Maxwell Abbell and Joseph J. Abbell. It is to be understood that if you accept the bid pursuant to the terms of the enclosed Extension, the bid you are accepting. is the original bid, modified by the understandings which we will have reached as a result of the various discussions that have taken place in the presence of Messrs. Gibson, et al. These discussions contemplated remodeling of the premises to be leased. Our negotiations concerning remodeling are, of course, subject to the lessor’s obtaining financing. At present I anticipate no difficulty, based on my preliminary investigation of the problem. By making the extension subject to the conditions contained in this letter, I am aware that all that has been done is to leave the matter open for further negotiations. The Messrs. Abbell understand that their original bid can no longer be accepted because of the conditions contained in this memorandum. However, this extension is being delivered with the understanding-that it merely constitutes authority to continue our negotiations and that no acceptance can be or is to be made until our negotiations have been crystallized in a formal written lease or contract to be executed by the Messrs. Abbell or their authorized agent.
The plaintiffs’ letter reads as follows:
In response to your letter to the undersigned dated November 28, 1952 requesting an extension of the bid which we submitted relative to the above mentioned property, this is to inform you that we do hereby grant an additional twenty (20) days from the date of this letter within which you may accept our bid, provided, however, that any such acceptance shall be subject to the conditions expressed in the memorandum of our agent, Bernard Greenbaum, attached hereto.
14. There were many discussions and conferences had between representatives of GSA, Treasury and Mr. Green- *569 baum between the date of the bid opening, October 31,1952 and the early part of 1953. It is clear that during these conferences both parties understood that the Government wanted to rent all floors above the first floor, and that the Government was not in a position to do the work of alterations. The discussions centered around the manner in which such alterations would be accomplished by the plaintiffs with reimbursement to the plaintiffs over the period of the Government’s tenancy on a five-year lease with an option by the Government to extend for two periods of five years each, a maximum of fifteen years, and if the Government should vacate earlier than the extended period, the unreimbursed cost of performing the alterations would be paid to the plaintiffs. In all discussions regarding the cost of such alterations, the figure of $600,000 was used.
15. In January 1953, Leonard Schanfield, a law partner of the plaintiffs (who had prepared the bid submitted by the plaintiffs), entered the discussions and presented a power of attorney to Mr. Gibson. Greenbaum’s power of attorney was never withdrawn, however. Schanfield’s power of attorney is dated December 8, 1952, and reads as follows:
KNOW All Men by These Presents, that
WheReas, we, Maxwell Abbell and Joseph J. Ab-bell, of the City of Chicago, County of Cook and State of Illinois, are the owners in fee simple of the property located at 235 West 46th Street, New York, New York, commonly known at HOTEL PARAMOUNT: and
Whereas, we, said Maxwell Abbell and Joseph J. Abbell desire to grant to our attorney, Leonard Schan-field, of the City of Chicago, County of Cook and State of Illinois, full power and authority to represent us and transact any and all business with respect to the above mentioned real estate;
Now, Therefore, we, the said Maxwell Abbell and Joseph J. Abbell, do hereby make, constitute and appoint Leonard Schanfield, our true and lawful attorney and agent, for us and in our name, to negotiate on our behalf with the United States Government or any department or agency thereof, or federal corporation, in regard to the leasing, remodeling, reconstruction and alteration of the aforementioned property, and in addition, to lease, contract or otherwise deal with said property, and to enter into, sign, execute and deliver any contracts, deeds, leases or other instruments whatsoever, *570 and to draw, accept, make, endorse or otherwise deal with any bills of exchange, checks, promissory notes or other commercial instruments relating to the leasing or such other contractual arrangements as he shall deem necessary or expedient to consummate and effectuate all negotiations and dealings which he shall have had or be advised of concerning the leasing of said property by the United States Government or any department or agency thereof, or federal corporation.
Ana further giving and granting unto our said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises and related thereto, as fully to all intents and purposes as we might or could do if personally present at the doing thereof, with full power of substitution and revocation; hereby ratifying and confirming all that our said attorney, or his substitute, shall lawfully do or cause to be done by virtue hereof.
IN WitNess Whereof, we have hereunto set our hands and seals, this 8th day of December, 1952.
16. The plaintiffs, who are lawyers, and Mr. Schanfield knew that the authority to contract for the rental of space was in GSA. The Treasury representatives, since Internal Revenue was to be the tenant in the leased premises, took an active part in many of the discussions however.
17. The Treasury Department approved of leasing the •space in the Paramount Hotel, and through its Director of Administrative Services requested the Commissioner of Public Buildings to authorize the New York Regional office ■of GSA to proceed to acquire such space. This was contained in a letter of December 19,1952, by which the Treasury Department agreed to reimburse GSA for rent and related costs in connection with the acquisition of space in the Paramount Hotel. This letter contained no limitation as to the amount of such costs.
18. On December 22, 1952, the Commissioner of Public Buildings in a letter to the New York Regional Director, GSA, approved of the acquisition of space in the Paramount Hotel by lease. The letter also discussed space in another building and reads in part as follows:
Based upon your recommendation, each of these proposed lease transactions is hereby approved pursuant to Section 6c (1) of PBS Order No. 4, Revised, subject to *571 the following limitations. This approval is applicable only to the excess of the term of each proposed lease over and above three years and to the excess of costs to be incurred over and above $250,000 per annum. A further condition of this approval is that each lease shall be submitted here for review prior to execution by the Government, although the terms and provisions of the leases remain for Regional Office determination.
In the latter connection, we suggest that, to the extent applicable in either or both of these cases, pertinent provisions patterned after the suggestions we made May 1, 1951 in the Sheraton Hotel case at Philadelphia be included in the proposed leases. This matter was discussed between our Mr. Raskin and your Mr. Gibson by telephone on December 15 and 22,1952.
19. On December 24, 1952, Mr. Gibson sent the following letter to the plaintiffs:
This will confirm telephone conversation of December 22,1952 with Mr. Anthony Boemi of this office, in which we advised that our Central Office in Washington, D. 0. has authorized us to accept your proposal dated October 29, 1952 for rental to the Government approximately 162,240 square feet of space contained in the building located at 235 West 46th Street, New York City, as submitted under Bid B of the above-mentioned Invitation.
You may consider this letter as an acceptance of your Bid subject to a mutual agreement covering the alterations which will be necessary to prepare the building for Government occupancy. Upon the conclusion of such an agreement a lease will be prepared in the office on standard form prescribed for Government use and submitted to you for execution.
20. On December 24,1952, Mr. Gibson’s superior, the New York Regional Director, sent a letter to the Commissioner of Public Buildings requesting that a “Certificate of Determination” concerning a limitation imposed by Section 322 of the Economy Act (Act of June 30, 1932 (47 Stat. 412)) be executed. That letter reads as follows:
Further reference is made to proposed lease covering the acquisition, by the Government of approximately 162,240 square feet of rentable area in building now known as the Paramount Hotel, located at 235 West 46th Street, New York, New York. This space is to be occupied by the District Commissioner’s Office of the In- *572 temal Revenue Bureau of the New York City District.
A full report has been submitted to your Chief, RPA&IT Branch, by memorandum dated November 28, 1952, with attachments thereto, prepared by Mr. Gibson of this office. It was reported that the bid submitted for the subject property is at a unit rental of $1.74 per square foot on an “as is” basis. In order to make the building suitable for the Internal Revenue Bureau, alterations are required, the cost of which has been estimated at a figure not to exceed $600,000. The Lessor has agreed to contract for such alterations as we request and will make direct payments from his own funds for all such work, provided he receives reimbursement from the Government. As Internal Revenue Bureau does not have sufficient funds available to make immediate reimbursement, Lessor agreed to amortize this expenditure plus 4%% interest over a 10-year period and will accept equal monthly payments until the full obligation for this alteration work is liquidated. In the event the Government fails to renew the lease after expiration of the first five-year firm term, the Government will be obligated to pay the balance of its unpaid obligation. 'The maximum that can be spent for permanent improvements under Section 322 of the Economy Act of June 30, 1932, as amended, will approximate $70,000. In order that we may proceed with the alterations, this office recommends execution of attached “Certificate of Determination”, waiving requirements of said Section •322 of the Economy Act of June 30, 1932, as amended, pursuant to Section 210 (a) (8) of Public Law 152, as amended.
This recommendation is based on the following:
1. The lease will be for a firm term of five years with renewal options to the Government for two additional terms of five years each.
2. The rental of $1.74 per sq. ft. plus cost of operation and, further, plus cost of alterations, amortized on expectant life of the lease to extend beyond five years, is the most economic space that can be secured in this particular locality. Average rental in this area is $4.00 per sq. ft.
3. The location is such that were Internal Revenue to vacate the premises, no difficulties would be encountered in relocating other Government agencies housed in more costly rented buildings.
4. Building is centrally located, easily accessible from all parts of Manhattan, Brooklyn, Queens and Long Island.
*573 It is the opinion of this office that to repair, improve and alter the Paramount Building at Government expense, is advantageous to the Government in terms of economy and efficiency.
Enclosure
Certificate of Determination
21. Numerous conferences were held between representatives of GSA and Mr. Schanfield on behalf of the plaintiffs ■concerning proposed drafts of a lease. Such conferences as well as many letters exchanging proposed drafts of a lease ■extended over a period of six or seven months. In the meantime, on March 25, 1953, Mr. Greenbaum and Mr. William A. Boyd, Assistant Chief of Construction and Bepair Division of the New York Kegional office, GSA, each made a detailed estimate of the cost of accomplishing alterations covered by the outline description of alterations referred to in finding 9. The preparation of such detailed estimate required four or five hours by each. Greenbaum’s estimate was $573,000 and Boyd’s was $752,000. Greenbaum and Boyd discussed each item of work together and the estimate of each was written down on a paper with nine sheets of supporting data. The first page reads in part as follows:

Ghreenbaum W. A. Boyé

Wrecking_ $50,000 $72, 000
Partitions Plaster on 4 or C. B- 31,200 52, 000
Plaster Patch_ 15, 000 15, 000
Ceramic tile Wall & Floors & Toilets- 27,000 27, 000
Asphalt Tile_ 23, 000 43,000
Painting_ 40,000 45, 000
Doors_ 21, 000 21,000
Plumbing_ 45,000 48, 500
Lighting_ 83, 000 97,000
Air C_ 78,000 90, 000
Steel & Glass Partitions_ 15,000 25, 000
Acoustic tile Ceiling_ 500 500
New Lobby & Ent & 1st fl change_ 20,000 30, 000
Structural inc. Windows & Glazing_ 8, 000 13, 000
Architects Fees_ 50, 000 50, 000
Interest_ 6,000 6, 000
Insurance_ 1, 000 1,000
Overhead Profit_ 60,000 20% 116,000
4
$573, 000 752,000
Bookshelves. 3, 500 3,500
$755,500
B. Greenbaum WA Boyd
*574 Upon completion of the estimate above, Mr. Greenbaum and Mr. Boyd brought it to a conference attended by Gibson, Schanfield and others. It was discussed by those named.
22. The letter quoted below was sent to Mr. Gibson on April 7,1953, by Mr. Schanfield:
At our last meeting which was held on March 24, 1953 in your office, at which there were in attendance the following persons: Messrs. Boemi, Cirrillo, Wolfe, Raskin and yourself, of General Services Administration, Messrs. Nowack [sic], Davis and Carrigan, of the Treasury Department, and Bernard Greenbaum and myself, on behalf of the owners of the Paramount Hotel, I set forth the position of the owners of the Paramount Hotel with respect to leasing of that property to the United States Government. You will recall that it is our position that our bid to lease space in the Paramount Hotel Building to the United States Government for use by the Treasury Department, has been accepted by the Government. You have submitted proposed plans for remodeling the space in accordance with the desires and needs of the Treasury Department, and we have informed you that you are free to make the remodeling alterations you desire. In view of the foregoing, we are now prepared to evidence the lease by entering into-a standard form lease agreement as required by the bid and your acceptance thereof.
Because of problems which the Government will encounter with respect to the matters of budget, time and similar problems peculiar to Goverment functions, you have indicated that it would be of great aid to the Government if a modification of our present agreement could be achieved whereby the Lessors would undertake to make remodeling changes on behalf of the Government. Pursuant to this expression of desire on the part of the Government, and solely for the purpose of determining whether it was feasible to give additional aid to the Government, we have, for the past few months carried on discussions concerning a proposed lease which would modify and supplant the lease called for by the terms of the bid and acceptance. To date various drafts of such an agreement have been considered. In our last discussion it appeared that the burden of responsibility which would be placed upon the Lessors under the proposed new agreement would be much greater than they would be inclined to undertake and certainly would be without any added compensation. Under our present arrangement the space to be taken by the Government *575 is on an “as is” basis and none of the risks and responsibilities of directing the remodeling fall upon the Lessors. Although we would like to aid the Government, we cannot do so at the cost of abandoning an equitable agreement for an onerous one.
I do not know whether any further discussions on this matter can be fruitful of an understanding, but in the interest of the time already spent, I am enclosing herewith my suggestions to you with respect to the form of an agreement covering the situation. These suggestions are not to be construed as an offer on the part of Messrs. Abbell to enter into a lease containing such provisions, but are only my suggestions to you as to the form in which you should make your proposed offer of a lease to supplant the standard form lease to which we we are entitled as of today.
In the event the parties do not agree to modify the Lease required by the bid and acceptance referred to hereinabove, this is to inform you that we shall expect rental payments to commence May 1,1958, or upon such sooner date as you take possession of the premises in accordance with the laws of the State of New York.
23. Other letters were exchanged concerning proposed lease provisions, and on April 23, 1953, Gibson sent the following letter to the plaintiffs to the attention of Mr. Schanfield:
This will acknowledge receipt of your letter of April 17th in reply to my letter of April 14th concerning revisions in the proposed lease for the Paramount Hotel Building, New York City.
The lease has been redrafted in accordance with the conclusion reached as a result of the above referred to correspondence and we are inclosing herewith three copies for your review.
We have also delivered a copy by hand to our Washington office and trust that their approval of the latest revision of this lease will be received promptly.
_ Unless you have any further suggestions toward additional revision of the lease it is requested that you retain the attached copies in your possession until you have been notified of the final approval by our Washington office which will permit the execution of the documents.
24. On April 23, 1953, Gibson also wrote to the Commissioner of Public Buildings, GSA, in Washington, advising that official of his negotiations as to the terms of the proposed lease with Schanfield concerning certain questions *576 raised by the Washington office about an earlier draft. He advised that he was sending Mr. Boemi of his office to personally deliver a proposed lease for approval of its terms.
25. On May 11,1953, the Acting Commissioner of Public Buildings wrote to the Regional Director, G8A, in part as follows:
‡ * * * *
The proposed lease submitted with the April 23 memorandum has been reviewed and no objection is interposed to the terms and provisions thereof. However, paragraph 22 might be strengthened by adding at the end the words “as determined by the Government.” We are retaining the copy of the lease for our records, and would appreciate being advised who executed it so we may conform the copy.
On April 24,1953, during a visit here by Mr. Anthony Boemi, of your office, the proposed lease was approved by the Office of the General Counsel as to the legal sufficiency, subject to (1) compliance with Section 322 of the Economy Act of June 30, 1932, as amended (of which the Lessor is considered to be on notice), and (2) our obtaining exemption from the 25 percent limitation thereof if necessary. There are attached the original and one conformed copy of the Certificate of Determination approved by the Administrator on May 8,1953, determining that the repair, alteration and improvement of these premises, at an estimated cost of $600,000 is advantageous to the Government in terms of economy and efficiency pursuant to Section 210 (a) (8) of the Federal Property and Administrative Services Act of 1949, as amended.
26. On May 12, 1953, Gibson sent the following telegram to the plaintiffs:
HAVE RECEIVED WASHINGTON APPROVAL POR PARAMOUNT HOTEL LEASE WITH PROVISO THAT FOLLOWING WORDS BE ADDED AT END OE PARAGRAPH 22 ££AS DETERMINED BT THE GOVERNMENT”. IF TOU CONCUR, PLEASE ADD SUGGESTED LANGUAGE AND INITIAL SAME. ALL COPIES OP LEASE IN TOUR POSSESSION SHOULD BE SIGNED AND RETURNED TO THIS OPPICE POR EXECUTION BT THE GOVERNMENT APTER WHICH COPT WILL BE PROVIDED POR TOUR FILES.
SUGGEST TOU IMMEDIATELT NOTIFT ARCHITECT APTER LEASE HAS BEEN SIGNED SO THAT THET CAN PROCEED WITH DETAILED PLANS AND SPECIFICATIONS. WE HAVE TODAT FURNISHED THEM PRELIMINART PLANS AND SPECIFICATIONS.
*577 27. In the meantime, Schanfield had had discussions with Mr. Arthur Malsin, a partner in the firm of architects which was later engaged by the plaintiffs to perform architectural services as required by the terms of the lease finally signed by the parties. Malsin was introduced to Schanfield through Mr. Greenbaum. On May 12, 1953, a copy of outline plans and specifications of the changes in the Paramount Hotel desired by the Government was handed to Mr. Malsin and Mr. Eeiman, one of his partners. This was done at a meeting attended by Harvey Gibson and others.
28. From the middle of May until the middle of July the plaintiffs were endeavoring to obtain financial commitments to enable them to perform the necessary alterations to the hotel. They were unsuccessful until assistance in this regard was given by representatives of the United States Treasury Department in Washington. Changes in the form of the proposed lease were suggested as a result of the commitment finally obtained by the plaintiffs of a $600,000 loan at 4% percent interest “in connection with the alterations and remodeling operations of the said premises to be undertaken by you under the terms and provisions of a lease of said premises you proposed to enter into with the United States of America”.
29. Further drafts of the terms of a proposed lease were exchanged along with letters from both sides, each contending for the inclusion of particular language. On August 17, 1953, Schanfield sent the following telegram to Harvey Gibson and Anthony Boemi:
PLEASE CONSIDER THIS AS NOTIFICATION OF TERMINATION OF NEGOTIATIONS FOR LEASE ON PARAMONT HOTEL IN ACCORDANCE WITH LAST CONVERSATIONS AND NEGOTIATIONS, UNLESS PROPOSED FINAL DRAFT OF LEASE IS IN OUR HANDS BEFORE END OF THIS WEEK
In all, at least seven drafts of a proposed lease were exchanged so that the lease finally executed became the language of both parties and no presumptions as to authorship will be considered.
30. The lease was finally entered into as of August 26,1953, between the plaintiffs (signed by each of them) and the defendant, acting through the GSA Public Buildings Service *578 by Harvey F. Gibson, Chief, Real Estate Division. It reads in pertinent part as follows:
* * * * *
2. The Lessor hereby leases to the Government the following-described premises, in the building situated at 235 West 46th Street, New York City, New. York, commonly known as the “Paramount Hotel”, viz:
Entire floors, beginning with the second (2nd) floor up to the eighteenth (18th) floor, both inclusive, contain a total of approximately one hundred sixty-eight thousand, six hundred and fifty-nine (168,659) square feet, and in addition the lobby entrance, foyer and new service entrance on the ground floor, which ground floor area contains approximately three thousand, five hundred and twenty-six (3,526) square feet and is reserved to service exclusively the demised premises to be used exclusively for the following purposes:
Office quarters and uses incidental thereto.
The square foot areas indicated above are approximate computations, established for budget purposes only.* The actual square foot areas shall be established from the original architectural drawings prepared pursuant to Paragraph 17 (a) of this lease.
3. To Have Aot To Hold the said premises with their appurtenances for the term beginning with the date building is ready for occupancy, following completion of repairs and alterations and renovations as itemized in Paragraphs 17 and 20 and ending with a date measured five (5) years from the date building is ready for occupancy. The phrase “date building is ready for occupancy ”, as used in this Paragraph 3, shall mean the date upon which there has been issued by the architect referred to in Paragraph 17 (a) a certificate that the building is ready for occupancy as an office building and said work itemized in Paragraphs 17 and 20 of this lease has been completed.
‡ #
5. This lease may, at the option of the Government, be renewed for two (2) additional periods of five (5) years each at the unit rates specified m Paragraph 7 and otherwise upon the terms and conditions herein specified, provided notice be given in writing to the Lessor at least six (6) months before this lease or any renewal thereof would otherwise expire.
6. The Lessor shall furnish to the Government, during the occupancy of said premises, under the terms of this *579 lease, as part of the rental consideration, the following:
No services to be furnished by the Lessor as part of rental consideration.
7. The Government shall pay the Lessor for the premises rent at the following rate: One Dollar ($1.00) per square foot per annum for the second (2nd) floor space and One Dollar and Seventy-four Cents ($1.74) per square foot per annum for all other space described in Paragraph 2 hereof, the actual square foot area of which shall be determined as provided in Paragraph 17 (a) hereof. Payment shall be made at the end of each calendar month in arrears without the submission of an invoice or voucher. Payment for any part-month rental will be made at the end of the first calendar month of the term of the lease.
❖ * * at *
10. If the said premises be destroyed by fire or other casualty this lease shall immediately terminate. In case of partial destruction or damage, so as to render the premises untenantable, either party may terminate the lease by giving written notice to the other within fifteen days thereafter, and if so terminated no rent shall accrue to the Lessor after such partial destruction or damage, but nothing contained in this Paragraph shall in any way relieve the Government of its obligation under Paragraph 17 (d) to repay the Lessor the unamor-tized balance of the “construction costs” provided for in said Paragraph 17 (d).
$ $ $ $ $
14. In performing any work herein required to be done by Lessor, the Lessor agrees to comply with all applicable State, Municipal and Local Laws and the rules, regulations and requirements of any departments and bureaus and all local ordinances and regulations.
# ‡
17 (a) The Lessor shall accomplish alterations and renovations to the building as hereinafter provided. Preliminary floor plans and specifications will be furnished by the Government. Upon Lessor’s receipt of the preliminary plans and specifications and executed copy of this lease, the Lessor shall immediately employ, subject to approval of the Government, an architect, registered in the State of New York, to prepare the necessary detailed plans and specifications for the remodeling of the premises as required by the Government and obtain all required permits for the remodeling and certificate of occupancy as an office building. Said detailed plans shall indicate thereon square foot areas of each floor, *580 computed by measuring from the inside plaster surface of all exterior walls, but excluding elevator shafts, stacks, stairways, fire towers, flues and any vertical shafts and their enclosing walls. No. deductions shall be made for columns, pilasters or projections necessary to the building. Before Lessor proceeds with the work of remodeling the premises, the architect’s detailed plans and specifications shall be submitted to the Government for review and final approval. After approval by the Government and the Lessor, which approvals shall be indicated by manual signatures of both the Government and the Lessor on each copy of the floor plans and on the last page of the written specifications, a copy of such approved plans and specifications shall be attached to this lease and made a part hereof.
17 (b) All costs, obligations or expenses (hereinafter called “construction costs”) which are attributable to proper prosecution of the remodeling referred to in Paragraph 17 (a) hereof (regardless of whether or not such “construction costs” are pursuant to a written contract) shall be paid by the Government to the Lessors as herein provided. By way of illustration, such “construction costs” shall include specifically but not exclusively, labor, material, insurance premiums, permits, taxes (exclusive of taxes and similar charges predicated upon profits or net income and real estate taxes), contractors’ and sub-contractors’ overhead and profits, architectural and engineering fees, interest at a rate not to exceed é%% per annum upon monies borrowed to finance the cost of the alterations and renovations required under Paragraph 17 (a) above, and all other items as shall be attributable to the Lessor’s performance of the alterations and renovations. The Government shall not be responsible for any interest or penalty assessed against the Lessor by reasons of delayed or late payments by Lessor of any installments due in accordance with any loan agreement pursuant to which such funds have been borrowed. Prior to incurring any “construction costs”, exclusive of architect’s fee, and after receipt of the architectural plans and specifications, Lessor shall, before a cut-off date to be designated by the Lessor, obtain from a minimum of four bidders a total bid on all the work to be accomplished under the architectural plans and specifications, with the Government reserving the right to name at least two of the bidders. Each bid shall specify the time within which the bidder agrees to perform the work and shall not be subject to withdrawal for forty (40) days from aforesaid *581 cut-off date. Upon receipt of the bids, which shall itemize the cost of the various types of work to be performed, Lessor shall submit same to the Government for approval, which action on the part of the Government shall be completed within ten (10) work days after submission thereof. If it shall appear that the “construction costs” will exceed Six Hundred Thousand Dollars ($600,000), then the Government, by mutual agreement with the Lessor, may modify all or such part of the plans and specifications as shall be necessary or desirable to reduce the total “construction costs”; provided, however, that nothing contained herein shall be construed to limit the total “construction costs” to Six Hundred Thousand Dollars ($600,000) if the Government, in the maimer provided herein, does not elect to limit such costs to Six Hundred Thousand Dollars ($600,000), in which event, any such increase shall be made only with the consent of the Lessor, which consent shall not be unreasonably withheld. Lessor, upon written notice to the Government, shall have the option to perform the alteration and renovation work to be accomplished, through themselves or their agents, in lieu of bidder approved by the Government, at a total cost to the Government to be established by mutual agreement. If no such agreement is reached within ten (10) days from date said written notice is received by the Government, then the Lessor shall perform the work in accordance with the terms and conditions contained in the bid approved by the Government, at a price which shall be the amount of the lowest bid received less Five Thousand Dollars ($5,000.). Lessor shall furnish to the Government copies of executed contracts and/or receipted invoices covering the work to be accomplished under said architectural plans and specifications, except that Lessor need not furnish copies thereof or any other data or materials whatsoever pertaining to any item, cost or expense included in the approved bid or any agreement for such work, provided, however, that the Lessor shall, in any case, furnish the Government with copies of loan agreements entered into by the Lessor for monies borrowed to finance the cost of alterations and renovations performed hereunder, and the Government shall have access and the right to examine any books and records or supporting documents reflecting any contracts or invoices which Lessor is required to furnish hereunder.
_ 17 (c) Lessor shall be responsible for the full supervision and accomplishment of the work in accordance with the plans ana specifications to be approved by the *582 Government. The Government reserves the right to perform such additional supervision as it deems necessary to protect its interest.
17 (d) At such time as the “construction costs” are ascertained and the building is ready for occupancy, as that phrase is used in Paragraph 3 hereof, this lease shall be modified by Supplemental Agreement No. 1 in the form attached hereto as “Exhibit A”, which agreement shall provide for payment of the “construction costs” to the Lessor in one hundred and twenty (120) equal monthly installments. The first installment shall be due on the last day of the month in which the date of occupancy has been established as provided in Paragraph 3 of this lease; each installment thereafter shall be payable at the end of each calendar month in arrears without the submission of an invoice. Said Supplemental Agreement No. 1 shall also provide, among other things, that Government shall have the option to prepay at any time all or any part of the unpaid balance of the “construction costs”, without premium, penalty or any interest in excess of such interest computed to date of such prepayment; that in the event the Government prepays the total “construction costs”, Lessor shall also arrange for simultaneous prepayment of any loans secured for the performance of the alterations and renovations, if not theretofore repaid by the Lessor; that in the event of any prepayment by the Government to the Lessor or upon full payment by the Lessor of aforesaid loans, the “construction costs” referred to in Paragraph 17 (b) hereof shall be recomputed to reflect the actual interest cost payable by the Lessor and reimbursable by the Government. Said Supplemental Agreement No. 1 shall also contain an Assignment of Claims Act Clause and shall also provide that upon full payment of all monies due for “construction costs” under said Supplemental Agreement No. 1, Lessor shall, if required by the Government, furnish the Government with an instrument releasing the Government from any and all further debts, claims and obligations for payment of any monies due for the “construction costs” under said Supplemental Agreement No. 1. All references to “interest” in this subparagraph 17 (d) shall mean only interest as an item of “construction costs” as illustrated in subparagraph 17 (b) hereof.
17 (e) In the event this lease shall be terminated for any reason whatsoever at any time during the term of this lease or any renewal thereof, the Government’s obligation to repay the “construction costs” shall not be *583 modified, diminished, or in any other way altered or affected.
$ # $ $ #
18 (a) For the period during which the alterations and renovations are carried on, the Government shall pay to the Lessor for real estate taxes, water, heat, electricity, and maintenance of the property, the sum of Ten Thousand and 00/100 Dollars ($10,000.00) per month for each full month the alterations and renovations are in progress. Any part-month will be figured on a proportionate basis. For the purposes herein, such real estate taxes, water, heat, electricity, and maintenance of property shall be referred to as the “interim maintenance charge”. The period during which alterations and renovations are carried on, shall be understood to mean the date upon which the construction contractor enters the demised premises with a work crew and actually begins work in accordance with the approved plans and specifications and will terminate on the effective date of this lease as established in accordance with Paragraph 3 of this lease.
18 (b) Notwithstanding the foregoing, however, in the event the alterations and renovations referred to in Paragraph 17 (a) hereof are not completed within the time specified in the approved bid referred to in Paragraph 17 (b) hereof, the interim maintenance charge of Ten Thousand and 00/100 Dollars ($10,000.00) per month shall cease, and the Lessor shall be notified accordingly in writing by the contracting officer executing this lease on behalf of the Government, provided, however, that the right of the Government to cease payment of the aforesaid “interim maintenance charge” shall not be exercised because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Lessor, or his agents or employees, including, but not restricted to acts of God, or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes if the Lessor shall within ten (10) days from the beginning of any such delay (unless the contracting officer executing this lease on behalf of the Government shall grant a further period of time) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time of completing the work when in his judgment the findings of fact justify such an extension. The Government shall take all *584 action and do all things required hereunder to facilitate and aid the Lessor in completing the remodeling as quickly as possible. Nothing contained in this lease shall be construed to deprive the Lessor of any claim for damages against the Government arising out of delay in completion of the remodeling, which delay is caused by the neglect or fault of the Government.
18 (c) Full payment for the “interim maintenance charge” shall be made to the Lessor after the effective date of this lease has been established in accordance with Paragraph 3 of this lease and upon Lessor submitting a properly prepared voucher or invoice requesting payment.
‡ ‡ $
20. During the continuance of this lease and at no expense to the Government the Lessor shall make all necessary repairs to and maintain the exterior walls, roof and structure of the building, including the exterior painting required for the preservation thereof, not caused by the negligence of the Government’s agents or employees, and the Lessor agrees to comply with all applicable municipal ordinances, regulations and statutes relating to ouildings and their equipment, and to ma,ke or have made such changes as may be required to bring such structure or equipment into conformity with existing codes. The Government agrees that it shall do nothing which shall constitute a violation of any applicable state, municipal and local laws or the applicable rules, regulations and requirements of any departments and bureaus and all applicable local ordinances and regulations. In addition the Lessor shall, at no expense to the Government, place all mechanical equipment and facilities in good operating condition prior to occupancy by the Government.
21. Throughout the term of this lease and any renewal thereof, the Government shall, at its own expense, furnish all necessary labor and material for the day-to-day custodial services of the demised premises, including interior painting, servicing, maintaining and repairing of all elevator equipment serving the portion of the building leased to the Government, alterations or additions to plumbing, heating and electrical facilities, partition work, repair or replacement of floor covering and any other physical improvement required for the specific needs of the Government in the demised premises.
22. Prior to full completion of alterations and renovations described in Paragraphs 17 and 20, the Govern *585 ment shall have the privilege, at its' discretion, of occupancy of any portion of the premises mentioned in Paragraph 2 which shall be in units of not less than an entire floor, which can be made available by the Lessor on a temporary monthly lease basis on the terms and conditions of this lease insofar as applicable to such portion, and if the Government exercises this privilege, it shall pay rent for the number of square feet occupied at the rental rate of One Dollar and Two Cents ($1.02) per square foot per annum, said lease to be terminated at the commencement of this lease. During the term of this temporary monthly lease, Lessor will furnish at no additional cost to the Government, water, heat, electricity and maintenance of the premises other than janitorial services and elevator operators.
23. In addition to premises described in Paragraph 2 of this lease, the Government shall have the exclusive use of the entire nineteenth (19th) floor at no additional rent or other costs to the Government other than maintenance and repairs thereto, as determined necessary by the Government.
sf: % íjc * *
25. The Lessor and the Government shall make a joint physical survey of the premises for the purpose of determining the condition of the building at the time this lease becomes effective as to the entire premises. The survey shall be made within thirty (30) days following the date of occupancy as defined in Paragraph 3 and at such time as is mutually agreed upon by both parties. The survey report shall be executed by the Lessor and the Government and shall become a part of this lease and have the same force and effect as if it were fully set forth herein.
ÍJÍ # i{C # £
28. The Lessor grants to the Government,. its assigns, agents and servants the right of access, ingress and egress to those portions of the building not leased to the Government, for the purpose of servicing, maintaining and repairing elevator equipment situated thereon and serving the portion of the building leased to the Government, ana the Lessor shall provide sufficient light at all times to insure safe passage through such portions not leased, but the Lessor shall not be responsible for damages arising out of any act or negligence of the Government, its assigns, agents and servants.
*586 30. During tbe initial five (5) year term and first renewal thereof, the Lessor shall, at no expense to the .Government, procure insurance and furnish the Government with a policy insuring the Government’s interest in the premises against loss by reason of fire or other casualty in an amount not less than the unamortized balance of the construction costs as from time to time may exist. The policy shall provide for loss payable to the Treasurer of the United States, c/o General Services Administration.
:}« Hs ❖
31. On September 3,1953, Mr. Edwin H. Lawton, Deputy Eegional Director, Public Buildings Service, approved a letter sent by Arthur Malsin, on behalf of his architectural firm to the plaintiffs concerning the fee payable to such architects for work in connection with the conversion work. That letter reads as follows:
This is to acknowledge our conversation of today wherein we agreed with General Services Administration Real Estate Division that our fee as Architects for the proposed conversion of the Paramount Hotel to offices for the Bureau of Internal Eevenue will be 7*4% of the cost of this conversion.
In arriving at this fee, it was agreed that we, as Architects, would not be required to make a survey of the electrical wiring as all new wiring will be installed. Also, we will be responsible for no work on the elevators and the heating distribution system other than moving radiators to conform with partition changes. It was also agreed that it would not be necessary for us to inventory the materials or equipment which will be salvaged.
In all other respects, we will perform full architectural services including preparation of _ preliminary drawings, working drawings and specifications, and will supervise the work from an office which we plan to establish in the Paramount Hotel Building.
In accordance with the usual procedure of payment of architectural fees, payments to us will be as follows:
25% of the fee upon completion of preliminary drawings; . . '
. . 50% on completion of working drawings and specifications; and . - :
. 25% upon completion of supervision of the work.
Will you please confirm this arrangement with both me and the G-overnment ?
*587 There was a marginal note written in ink and initialed by both Malsin and Lawton as follows:
If the work stops payments of our fee will be negotiated on the basis of the amount of work we have performed at the time
32. The outline description of alterations and preliminary floor .'plans which had been furnished to the plaintiffs •through Mr. Schanfield were regarded by both parties to the lease to be the preliminary floor plans and specifications to be furnished by the Government referred to hi paragraph 17 (a) of the lease.’
■ 33. On September 17, 1953, the plaintiffs wrote to Sam ders-Malsin-Reiman confirming the terms of agreement contained in their letter to plaintiffs dated September 3,-1953 as the basis upon which they were retained as architects with respect to the proposed remodeling of the Paramount Hotel in New York City. Mr. Gibson was notified of the above by letter of September 17.
. 34. On September 18, 1953, Schanfield sent the following telegram to Gibson:
RECEIVED NEW COMMITMENT FROM BOWERX’ SAVINGS BANK DATED SEPTEMBER 15, 1953, WHICH MEETS REQUIREMENT OF MX LETTER OF SEPTEMBER 2, 1953, ENCLOSING PARAMOUNT LEASE. PLEASE SEND ME ACKNOWLEDGEMENT THAT LEASE IS NOW IN FULL FORCE AND EFFECT.
35. On September 22, 1953, replying to the above, Gibson wrote to the plaintiffs that “* * * lease is now considered to be in full force and effect.”
36. The architects installed an office at the hotel and proceeded with the preparation of preliminary plans preparatory to the preparation by them of detailed plans and specifications referred to in paragraph 17 (a) of the lease. A Mr. Schildback, who was an architect, was in charge of the office and he,' as well as Mr. Malsin and Mr. Reiman, held frequent discussions with Mr. Boyd of GSA, and Mr. Car-rigan of Treasury. There was also much correspondence as to various details incident to the proposed alterations.
37. By October 13,1953, the architects had given Mr. Cardigan preliminary'plans of most floors of the building. On •that date, Mr. Norman D. Nowak, Assistant Regional Com *588 missioner (Administration) sent a letter to the architects which reads in pertinent part as follows:
It is understood that the Government will, according to the terms of the lease, reimburse the lessor for the alterations to the first floor, only in those portions which are being altered for the exclusive use of the Government, to wit; the stairways and that portion of the Service Hall in back of the entrance doors, to same, including the entrance doors; the Lobby and the entrance to same from in back of the street entrance doors, including the entrance doors.
38. Receipt of the above letter was acknowledged by the architects, but on October 15, 1953, Schanfield sent the following letter to Mr. Nowak:
A copy of your letter of October 13, addressed to Sanders, Malsín and Reiman, Archtects, relative to plans for the Paramount Hotel Building, has been called to my attention by Mr. Bernard Greenbaum. Inasmuch as you have not directed any copy of this letter to the owners of the property, we presume that there is no intention on your part to give formal notice of any intentions or desires of the Government as expressed in that letter. However, in view of the fact that this letter is addressed to the Architects and most of its contents refers to matters that can only be ultimately determined between the Government and the owners, on behalf of the owners I wish to go on record to the effect that the Architects have no authority to agree upon any changes affecting the terms of the lease or to grant any approvals for the owners which are called for by the terms of the lease.
Please be advised that in the event you desire approval of the matters raised in your letter of October 13,1953, or of any other matters which may hereafter arise with respect to the plans or remodeling of the Paramount Hotel Building, you should address a communication to the owners with a copy for my attention inasmuch as the owners have not given any other person authority to act in their behalf.
Inasmuch as Mr. Greenbaum and I will be in New York on Tuesday of this coming week, we will meet with you and discuss some of the matters which appear in your letter of October 13th and which we believe will be detrimental to the interests of the owners. I am sure that we can work these matters out in accordance with our previous understandings. Until we have discussed them, however, I would suggest that it would be better *589 to have Mr. Malsín direct his energies to other matters. For example, the matter of installing a cigar counter in the main lobby, as well as putting in facilities for cigarettes and a. snack bar, etc., should be held up and he should continue with the more important aspects of the plans.
With respect to the matter of air-conditioning, this is the first tme that we have been informed that any ruling prohibits the installation of air-conditioning equipment. Mr. Greenbaum informs me that one of the principal reasons why he was prepared to bid on it was that he expected to be able to do the air conditioning more cheaply than you would obtain it elsewhere. Furthermore, our discussions always encompassed the fact that the building would be air-conditioned, if it could be done within the $600fl00.00 figure. [Italics supplied.]
I note that in your reference to the first floor you state that the Government will only pay for those alterations which are for the exclusive use of the Government. The preliminary plans show a truck bay which certainly is not for our use, and if the Government does not want this truck bay, then unless it is required for an office building it will not be necessary to include it in the plans.
There are a few other points in your letter which require further discussions before they can be crystallized in the plans. I am confident we can dispose of all of these matters to our mutual satisfaction.
See you on Tuesday or Wednesday.
Best regards.
39. Nowhere on the outline plans and specifications furnished to the architects by the Government did a truck bay, fire alarm or sprinkler system, nor any reference to such appear.
40. On October 20, 1953, Gibson sent the following letter to the architects:
In checking over our records, we find that we have not furnished you with a copy of the final lease entered into by the Government for the acquisition of the Paramount Hotel Building. We wish to correct this oversight and are attaching a photostat copy of our lease.
We wish to bring to your particular attention that the lease provides for Lessor obtaining Government approval before proceeding with any work, and also that detailed plans and specifications for alterations must be submitted for Government approval. It is further *590 stated in the lease, under paragraph 24, that references to Government in this lease shall mean the General Services Administration or its successors.
It is therefore suggested that you ascertain beforehand whether any request received by your office meets with the approval of this office.
A copy of this letter is being furnished Mr. Nowak of the Internal Eevenue Service.
41. Sometime shortly after October 1953, with a set of preliminary floor plans, someone in the Regional Commissioner’s office (Internal Revenue) made a layout on such plans showing the location of the desk and chair for each individual in each office on all floors above the ground level.
42. There is in evidence as plaintiffs’ exhibit 120 a preliminary floor plan of the first floor of the Paramount Hotel which was prepared by Sanders-Malsin-Reiman on or about July 16, 1953, and which shows a truck bay at the west end of the building at ground level. Apparently this was prepared as a preliminary study concerning the use of space in the hotel which was not to be rented to the Government under the proposed lease (which was not to be signed for another six weeks). In any event, Malsin then knew that a truck bay would be required. This fact was not communicated to GSA until about October 15,1953. This was in the form of a copy of a letter from the plaintiffs’ architects to Mr. Nowak of Internal Revenue which had been sent to Edwin H. Lawton, Deputy Regional Director, GSA (Mr. Gibson’s superior), which states in part as follows:
jjs s& ifc # H*
In regards to the paragraph on what items the Government should pay for on the first floor, I feel the truck-bay should be included in these items as the New York Building Department requires this facility in connection with the office space in the building. I have already talked to Mr. Carrigan about this, as we will not be able to get approval on the filed drawings unless the truck-bay is included in the plans.
Thank you for your cooperation in working with Mr. Schildback.
43. The architects had, however, on about October 11,1953, given Mr. Carrigan of Treasury a preliminary plan which ■showed a truck bay. This caused Mr. Nowak to write to *591 the architects commenting that the Government would reimburse the lessor for those alterations on the first floor only in those portions where the alterations were for the exclusive use of the Government. (See finding 37.)
It is noted in this connection that the Government was not, by the terms of the lease, to rent the major portion of the first or street floor of the hotel.
44. Apparently the preliminary plan for the first floor submitted to the New York City Building Department by the architects did not show a truck bay because on November 1, 1953, the architects received certain objections raised by that department as to plans it had considered. One of the objections was due to the lack of a truck bay on the plan submitted.
45. There had been some discussion between the architects and Mr. Carrigan of Treasury as well as between Schan-field and Malsin (one of the architects) for the plaintiffs and Mr. Nowak of Treasury concerning the obtaining of a waiver of the zoning requirement by the City of New York for inclusion of a truck bay. This was an important and costly item as was well known to the plaintiffs. The plaintiffs did not directly discuss the matter with the contracting officer for a period of about two months. It is a fact that Gibson knew about the matter of the truck bay but from all the evidence it is found that neither party wanted to proceed alone in presenting the question of a waiver to the City authorities. It appears that each party wanted the other to obtain the waiver.
46. In the meantime the architects proceeded with the many other matters incident to their work. This included, among other things, their retaining consulting engineers in the electrical, mechanical and structural fields for the rendition of assistance in those fields of activity.
47. On December 16,1953, the architects sent the following letter to Mr. Gibson:
We are enclosing a set of the final plans which we filed with the building department this morning and are awaiting your approval so that we can finish the working drawings.
Kindly send this approval to the owners and also a copy to us.
*592 ■ 48. On January 6, 1954, the architects sent the following letter to Maxwell Abbell with copies to Harvey Gibson and Mr. Nowak:
Yesterday, we met with representatives of General Services Administration and the Department of Internal Revenue, and final changes in plans were ironed out and verbal approval given, pending submission of the drawings showing these revisions. The changes were minor changes in the upper floors involving partition and door locations.
We have since set the end of February as the completion date for all drawings and specifications (Architectural, Mechanical, and Structural). However, this date is contingent on having no further changes from the tenants, owners, or the building department.
49. On January 12 1954, the Acting Deputy Regional Director, GSA, wrote the plaintiffs as follows:
A meeting was held in the office of Sanders-Malsin-Reiman, Architects of the Paramont Hotel Building on January 5, 1954 which was attended by representatives of the architect, Bureau of Internal Revenue and General Services Administration. It was agreed at this meeting that Government approval would be given in writing for the following items to be included in the work required to renovate the Paramount Hotel Building for the Bureau of Internal Revenue.
1. Special architectural treatment for the Regional Commissioner’s office suite only.
2. Air conditioning of lobby and stock room area regardless of a final determination as to whether or not the balance of the building will be air conditioned.
You may consider this letter as authority to include the above items in the plans and specifications being prepared by the architect.
A great deal of concern was expressed as to the timing for completion of this work as the architect indicated that the present schedule would call for completion some time during July or August. It is the desire of the Government to occupy the premises not later than June 80, 1954, since our leases on space to be vacated in connection with this occupancy terminate on that date. Following the meeting we received a letter from the architect which indicated that the end of February was set for the completion date for all drawings and specifications which should greatly enhance our hopes for meeting the target date of June 30,1954.
*593 We will appreciate anything which you can do to expedite this work insofar as serving notice to permanent tenants in the building and making the necessary arrangements for obtaining bids as soon as plans and specifications are completed.
50.On January 21, 1954, the architects wrote to Gibson,. the contracting officer, with copy to Maxwell Abbell as follows:
At our meeting yesterday with Messrs. Boyd, Boemi, and Gallogly, I was surprised to learn that no action had been taken in regard to the Building Department’s requirement that a truck-loading berth be included.
As I explained to you and Mr. Nowak over the telephone last week, we are most anxious to have a decision on this matter, as the inclusion of this berth may cause considerable delay in settling on a location suitable to both the Government and the owner and in additional structural design required by such a change.
I think yesterday’s meeting was a profitable one in which many details were ironed out satisfactorily. However, our mechanical departments have been held up on certain phases of the work, pending a decision on the cafeteria and the electrical outlets for clocks. We are trying very hard to finish our work according to the schedule given you in my letter of January 6th, addressed to Mr. Maxwell Abbell.
51. In a meeting at the office of the architect at the hotel shortly before February 4, 1954, attended by Gibson, and others of GSA, Carrigan and Nowak from Treasury and IBS, and Greenbaum, the main topic for discussion was the truck bay. The architect said that someone should try to obtain a waiver of the truck bay requirement and requested those Government representatives present to accompany him to the New York City Building Department for that purpose.
52. On February 4, 1954, a meeting was held at the office of the New York City Building Department. This was attended by Mr. Gibson, Mr. Lawton of GSA, and Mr. Green-baum and a Mr. Genz who had previously acted as consultant to the architects in matters before the Building Department. Mr. Beiman, the architect, told the Chief Engineer of the Building Department that if they were forced to include the truck bay in the building it would require *594 many structural changes and involve great expense. The question was raised by the Chief Engineer whether the Government was to be the sole tenant in the building in which event' it would not be necessary to file plans with the City authorities. When it .was explained that the Government would not be the sole tenant, the group was told that the truck bay was a zoning requirement which could be waivéd only by the Board of Standards and Appeals. It was therefore suggested that' plans be filed with the- Building Department which showed the truck bay and this was done.
At the above meeting, the matters of fire alarm and sprinkler system were discussed.
53. Thereafter discussions were had between Gibson and Schanfield concerning the truck bay. Each took the position that the truck bay was a matter of responsibility, as far as cost was concerned, of the other. Schanfield then on February 12, 1954, wrote to Gibson as follows: ,
Dear Haevet :
Pursuant to our recent telephone conversation, I am setting forth herein the position of the owners of the Paramount Hotel concerning two problems that have arisen in construction of the lease executed by the owners and the United States Government. I hope you will forgive me for adding a few comments of my own.
It is our understanding that the City of New York has indicated that they will not approve the plans for conversion'of the hotel to an office building unless provision is contained in such plans for a truck bay. In addition, the City has indicated that a sprinkler system must be installed in the building. You have stated that the Government does not believe that it is responsible for any costs that will be incurred by reason of the construction and installation of these two items.
It is the position of the owners that the lease quite clearly imposes upon the Government all costs and obligations incurred in the construction and remodeling of the hotel to an office building for use by the Government. All costs from the architectural plans through the complete installation of the truck bay and sprinkler system are costs which must be borne by the Government. Paragraph 17-A of the lease requires that the Architect prepare detailed plans from the preliminary plans and specifications submitted by the Government. He is required to obtain all required permits for re *595 modeling and for the certificate of occupancy. Under Paragraph 17-B all costs and obligations attributable to the remodeling required in Paragraph 17-A shall be paid by the Government. Construction costs specifically include costs of permits. The Architects under the preceding paragraphs are required to draw plans which will enable them to obtain all necessary permits and the cost of all such permits are to be. borne by the Government.
You have made reference to Paragraph 20 as authority for the proposition that the owners must pay for the costs of the above mentioned construction. Paragraph 20, and its reference to compliance with Municipal ordinances, refers to the Lessor’s obligation during the continuance of the lease. It does not refer to Lessor’s obligation prior to or during construction. It is clearly the intention of this paragraph that after the Government has taken possession and the lease is in effect, if any Municipal ordinances or other statutes require changes in the building, the Lessor will do what is necessary to conform.
On a personal level, your bringing up this matter gives me quite a surprise. I suppose by this time I should be inured to surprises with respect to the position taken by the Government from time to time in this matter. Somehow I cannot adjust to the fact that the Government will seek to do business on a standard that is no doubt common in the business community. From the very_first time that I entered into conversations and negotiations concerning this lease, one statement has been cardinal to our position, viz, whatever costs are incurred in order to make this building suitable for occupancy by the Government are to be borne by the Government. How many times in negotiating out particular points have we gone back to this statement? How many times during negotiations has it been necessary to point out that the only reason we were doing this job of remodeling instead of the Government was because the Government stated we could do it more cheaply than they ? Time and again someone would lose sight of this fact and so ask us to bear some cost which the Government would have had to bear if they had agreed to do the job themselves. You or one of your assistants would try to impose upon us some costs which you would say should fall on us because we were doing the remodeling. Then we would have to go back again through the whole history of this thing and point out that we were doing this for the Government, to save *596 the Government money (at least the Government, said savings would result, for we did not know whether we could do it more cheaply) and that any cost which the Government would have incurred had it taken the building as it was offered in the initial bid,. i. e., in “as is” condition, are costs of construction which the Government must repay to us. It took us a long time, Harvey, but I am confident that at the-time the lease was signed you understood, as did we, that no part of the cost of remodeling was intended to be borne by us or could be borne by us.
These two items are no doubt unexpected. There could well have been, and I believe that there have been some items of structural work which were not anticipated in the first instance either. Nevertheless, I do not think that it is fitting on your part to search the lease over for some clause which might provide you with an escape from a burden which though unexpected falls within those to be assumed by the Government. I am personally disappointed at this request, because I do not want to be reduced to a level of so-called ordinary business ethics in dealing on this lease.
There is no doubt in my mind that in construing the lease, as well as all other documents of correspondence and drafts which preceded it, that our position in this matter is correct, but it is even more important to me that you would agree with us on the basis of the understanding we had throughout negotiations concerning costs. I have no doubt that a number of other unexpected items will arise before completion of this project. One or the other of us may not have provided for them adequately in the lease. I would like to feel that at that time we could settle these matters on the basis of our original intentions even though not incorporated in the lease. These negotiations went on so long that both parties are pretty well apprised of what the other understood by the language of the lease.
No question should ever have arisen concerning these two items of construction. They are clearly costs of construction within the language of the lease. In addition, they are matters that fall within the purview of costs of construction as we both understood that phrase. I don’t think it is appropriate for me to demonstrate in this letter, that everybody connected with negotiating the lease understands that fact, but when I am next in New York I would like to take the time to show you that there should be no question or even any lapse of memory on a matter so basic to all the negotiations.
*597 Please let me hear from you on this matter as soon as possible.
Yours very sincerely,
(s) Leonard,
LeoNabd Schanfield
LS:DS
P. S. I have been in constant touch with Mr. Malsin and have been urging him to proceed at all times with as much haste as possible. He states that he is doing so and that as a matter of fact he has always done so. I will do my best to get these plans out for bid within a few days after I am informed that full sets of plans and specifications are ready. I know the Government will cooperate in this regard.
54. Gibson then sought information from the Regional Counsel’s office.
55. On March 12, 1954 the architect wrote Gibson as follows:
We are enclosing a set of the final architectural drawings, sheets A through A-34 inclusive, dated March _ 1st, together with a draft of the architectural specifications for your approval.
The balance of the drawings and specifications, which include electrical, plumbing, sprinkler, airconditioning, and structural will be delivered to you on Wednesday, March 17th. As I have told Mr. Boyd, during the past two weeks the delay in all phases of the work has been due to the tremendous difficulties encountered in the inclusion of the truck-bay.
As soon as the specifications are approved by the owners and yourself, we will proceed with having them printed.
56. Apparently the plaintiffs had sent the plans and draft of specifications which they had received from the architects to Mr. Greenbaum for his comments. On March 19, 1954, Joseph J. Abbell sent a letter to Mr. Gibson enclosing Greenbaum’s comments (consisting of four single-spaced letter size typewritten sheets). Abbell’s letter of transmittal reads as follows:
March 19,1954
Enclosed find memorandum to Messrs. Leonard Schanfield and Maxwell Abbell from Mr. Bernard Greenbaum. Unfortunately, Mr. Schanfield had to leave the city before he received a copy of this report *598 and in looking it over I thought it of such import that I thought I had better transmit it to you.
It would seem that we could have little objection to these plans and specifications with the exception of the controversial matters, but it would also appear, based on this report, that it is very likely that the cost will considerably exceed the budget as set forth in the lease documents between us.
■ Under these conditions, it would appear that you should increase your budget accordingly, if necessary, for which we would be delighted, but it would be necessary for us to make further arrangements on the mortgage with the Bowery Savings Bank. Or, you have the alternative of minimizing your requirements to come within the budget.
If you should decide to increase your budget in accordance with the above it would, of course, be subject to our being able to increase the amount of the mortgage and increasing your payments to us as a result therefrom.
Greenbaum’s comments read in part as follows:
$ ‡ ‡
We are considerably alarmed as to the economic factors vs. the original contemplation of the expenditure for the work here because of the many additions and extensions to the original contemplated improvements. In the cursory estimate made between Mr. Boyd, Mr. Kerrigan [sic] and the undersigned, the following items were not contemplated nor included and obviously the thinking on our part that the work to be done should run under $650,000 did not contain such additions and extensions.
Of major importance, and of great impact, are the following—
íjí # 5]i # #
The truck bay was, of course, not considered, and I urge that something be done to eliminate this item which is a very tough request and completely unnecessary for this type of building and operation.
The alarm signal system is also an unusual request on the part of the building commissioner, and we can see little reason for such a request when this is not generally adhered to in other office buildings in New York.
The sprinkler system in the public space, which it appears there is a reasonable request for, was not in the original contemplation.
*599 57. On April 9,1954, Gibson wrote three letters to Schan-field which together showed that except for certain details not now in dispute the mechanical, electrical and structural drawings which had been submitted were reviewed and approved with the exception of all work required in connection with the truck bay, sprinkler system and fire alarm system.
58. On April 9,1954, Maxwell Abbell wrote a letter to Mr. Edmund P. Mansure, Administrator, GSA, in Washington, which was highly critical of the part played by the Government representatives in this transaction. The letter requested an opportunity to confer with Mansure personally during the following week.
59. On April 12,1954, Gibson wrote a letter to Schanfield in which he stated that his office had reviewed the architectural drawings and the draft of the architectural specifications. There were a number of exceptions made as to matter therein contained about which no serious contention was made but it also excepted from approval “all work in connection with the truck bay and the sprinkler and fire alarm system, * * * ”
60. On April 13, 1954, Schanfield wrote to Gibson as follows:
I am in receipt of your three letters dated April 9, 1954, wherein you have indicated your approval of the following: Electrical drawings E-l to E-8, inclusive, and the electrical section of the specifications pages 1 to 30, inclusive; mechanical drawings M-5 to M-24 inclusive, and structural drawings S-l to S-7, with certain exceptions as follows:
1. Fluorescent fixtures are to be eliminated from all toilet rooms and incandescent lighting fixtures used instead.
2. All work required in connection with the truck bay.
3. All work in connection with the sprinkler and fire alarm system.
We have no objection to elimination of the fluorescent fixtures in tbie toilet rooms and the substitution of incandescent lighting fixtures in their stead, and will so instruct the architects. With respect to the work required for the truck bay and the sprinkler and fire alarm system, we previously indicated to you that we *600 would be willing to consider some revision of the plans with regard to these two matters, but, as you know, the requirements for the truck bay and the sprinkler system and fire alarm system are required by the ordinances of the City of New York, Our position in this matter was more particularly expressed in the letter to you dated February 12, 1954. In the event that you are able to obtain some waiver of these requirements from the City of New York, please let us know and we can mutually determine what adjustments, if any, should be made in the plans.
In no event do I believe that we should delay placing out these plans for bid in accordance with the terms of the lease.
Please let me hear from you on this matter as quickly as possible.
61. On the next day Schanfield replied to another letter of Gibson’s and closed as follows:
‡ ‡ ‡ ‡
I am awaiting your advice as to the placing out for bids of the plans approved to date. Also, would like to know what steps, if any, you are taking with respect to obtaining waivers of the City requirements concerning the truck bay, sprinkler and alarm system.
62. On April 22,1954, Schanfield told Gibson in a telephone discussion that they, meaning the plaintiffs* wanted the truck bay so that they would be protected after the Government moved out of the premises.
63. Mansure wrote to Maxwell Abbell on April 16 advising .that he was sending two top men from Washington to New York to investigate the matters complained of by Abbell and that he could see Abbell in Washington on May 5 or 6.
64. On May 4,1954, Maxwell Abbell at his request met with a number of Government representatives, including Harvey Gibson, Anthony Boemi and others. This was his first personal discussion of the Paramount Hotel lease with any Government representative.
65. On May 6, Schanfield and Maxwell Abbell attended a meeting in Washington at which Mansure was present for a very short time. There was present, in addition to the above, Mr. Strobel, who had been designated Commissioner of Public Buildings, GSA, but who had not yet assumed the office. Mr. Strobel was then acting as a consultant in the *601 Commissioner’s office. Mr. Maxwell Elliott, General Counsel, and Mr. Joseph E. Moody, Assistant General Counsel, also were in attendance. The principal matter under discussion was who should be required to pay for the truck bay. and the fire alarm and sprinkler system in connection with the proposed alterations to the Paramount Hotel. Abbell and Schanfield took the position that under the terms of the lease the Government was required to pay for such items because they said they were required by zoning or building regulations of New York City. The GSA group took the position that under the terms of the lease, the Government was not obligated to pay for the above-mentioned items. Mr. Moody also expressed certain doubts as to the enforceability and invalidity of certain lease provisions. The meeting broke up on a note of disagreement by the two parties. Schanfield had indicated at the conference that the plaintiffs would not do anything to prejudice their rights under the lease and something to the same effect was said by Elliott and Moody.
66. On May 12, 1954, Mr. Joseph E. Moody wrote a letter to Schanfield, as follows:
In accordance with the understanding reached at our conference on May 6, there are enclosed herewith two copies of a draft of a proposed Supplemental Agreement terminating the lease on the Paramount Hotel.
Please let me have your comments and recommendations as soon as possible.
By the terms of the draft which was enclosed, the termination was without prejudice to the rights of either party.
One of the clauses reads as follows:
Whereas, it has been determined that the cost of such alterations will far exceed the amount of such cost anticipated by the parties at the date of execution of the lease; and
67. On about May 11, Mr. Boyd of GSA and Mr. Malsín, one of the architects of the firm retained by the plaintiffs, were comparing the estimates that each had made of the costs of accomplishing the alterations covered by the plans and specifications which had been prepared by the architects. Both agreed that the cost would be between $1,100,000 and *602 $1,200,000. Of these amounts Mr. Boyd estimated the cost of the truck bay at $100,000 and the sprinkler system at $50,000.
68. On May 14,1954, Schanfield wrote to Gibson as follows:
In accordance with the terms of the above mentioned lease, Sanders-Malsin-Beiman, Architects, have prepared detailed plans and specifications pursuant to the preliminary plans and specifications and subsequent instructions thereon submitted to them by you. These plans and specifications were submitted to you for your approval in accordance with the terms of the above mentioned lease. You have failed to give your unqualified approval of these plans and specifications indicating that certain items in the plans and specifications do not meet with your approval. These items which you have refused to approve are required by city ordinances and are necessary in order to obtain building permits.
The lease requires that the final plans and specifications comply with all ordinances and that the Architect prepare plans which will enable him to obtain all necessary permits for remodeling. The plans and specifications submitted are the plans and specifications required by the terms of the lease.
We have done all that is required of us by the lease. Your refusal to approve the plans and specifications in the form submitted constitutes a violation of the terms of the lease. Under these circumstances it is impossible for us to proceed any further with the terms of the lease. Please consider this as notification of the fact that you have violated the lease, that your violation has prevented us from further performance of any of the terms of the lease and that consequently we shall proceed to pursue all remedies afforded us on account of this breach of agreement.
69. On May 17,1954, Schanfield wrote the following letter to Joseph Moody of GSA, Washington:
I have received your letter of May 12th and the draft of agreement which you enclosed therewith. Although the agreement does not reflect the discussions we had at our last meeting, I think it is premature for me to submit a counter draft. As soon as I have an estimate of the damages wé have incurred to date by reason of this transaction, I will call or write to you, at which timé, I believe, we can more appropriately consider the terms *603 and conditions of an agreement which would reflect our discussions of May 6th.
70. On June 4, 1954, Joseph Moody, Assistant General Counsel of GSA, wrote to- Schanfield as follows:
Your letter of May 14, subject as above, has been referred for my attention.
The detailed plans and specifications prepared by Lessor’s architect are not in accordance with but, to the contrary, include certain structural and other changes neither called for in the preliminary plans and specifications furnished by the Government nor desired by the Government.
Your advice to the effect that the changes in question are required by city ordinances as a prerequisite to obtaining a building permit has been noted. However, the obligation of complying with city ordinances and regulations is imposed upon the Lessor by paragraph 14 of the lease. In this connection it has been determined that the Lessor has not yet exhausted the procedures available to him under municipal regulations to obtain relief from the requirement.
Accordingly, we must state our unequivocal disagreement with your statement that you have done all that is required by the lease.
Your refusal to proceed in accordance with the terms of the lease with appropriate action for alteration of the premises pursuant to the plans and specifications approved by this Administration constitutes a breach of the lease relieving us from further obligation thereunder.
In view of the foregoing, we shall proceed with such action as may be necessary and appropriate for the protection of the Government’s interest.
71. Another meeting was held on June 8, 1954, in Mr. Mansure’s office in Washington. Mr. Mansure was present for only a few minutes. Maxwell Abbell and Schanfield were present on behalf of the plaintiffs. Strobel, Elliott and Moody were present on behalf of the defendant. The latter group wanted to have a few hours to consider a further proposal to the plaintiffs and so a recess was taken in the meeting which convened again at about four o’clock on that day. Strobel then said that the Government would like to go ahead with an expenditure of no more than $600,000 for al *604 terations. He stated further that he had received an estimate of the alteration costs as high as $1,800,000. He proposed that the alteration work be revised so as to leave the individual bathrooms intact, instead of removing them as contemplated by the plans of alteration. Abbell told Strobel that such a proposition was ridiculous. He said that he wouldn’t have either a hotel or an office building and at the termination of the lease he would stand to lose a great deal of money and the meeting ended in complete disagreement.
72. This suit was filed October 6,1954.
73. The inclusion of the truck bay, as proposed in the plaintiffs’ architects’ plans and specifications, would have required extensive structural work not contemplated by the defendant in its preliminary plans and specifications. Such work was not contemplated originally by the plaintiffs, either. For example, the bases of a number of supporting columns, 20 stories high, would have to be moved, and 12 new structural columns installed. This in turn would have necessitated costly work of shoring the building temporarily by the use of heavy jacking and large beams to support the building sufficiently while the old columns were being moved and new ones were being installed. Horizontal steel beams would have to be installed to carry the load formerly carried by the bases of the original columns. In the course of that work it would have been necessary to relocate a great number of electric lines and plumbing and heating pipes. The inclusion of a truck bay also would have required the installation of several large concrete slabs, the construction of an additional wall and entrance door, and changes to the front wall and to the second floor of the building. To properly execute that work a considerable amount of demolition, as well as a considerable amount of new masonry and concrete work, would have been required.
conclusion of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition is therefore dismissed.

 These terms are not conclusive. See State v. McCombs, 156 Kan. 391, 133 P. 2d 134; Whiteside v. Oasis Club, 162 Mo. App. 502, 142 S. W. 752; State v. Hall, 25 N. D. 85, 141 N. W. 124.

[Italics supplied.]