In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3124

CITADEL GROUP LIMITED, a Delaware Corporation,

*Plaintiff-Appellant,*

*v.*

WASHINGTON REGIONAL MEDICAL CENTER,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-1394—**Marvin E. Aspen**, *Judge.*

ARGUED APRIL 11, 2012—DECIDED AUGUST 15, 2012

Before WOOD, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* This is a diversity case arising from the breakdown of contract negotiations between Citadel Group Limited and Washington Regional Medical Center over the development, construction, and lease-back arrangement of a medical office building. Washington Regional entered into a contract with Citadel to proceed with pre-construction project development, which

contemplated the subsequent execution of ground and space leases. Yet, negotiations over the leases proved unfruitful and Washington Regional decided to move forward on construction internally (without an outside developer). Citadel sued for its costs and lost profits on the deal.

We found in a previous opinion that the district court had personal jurisdiction over Washington Regional to resolve this dispute. *See Citadel Grp. Ltd. v. Washington Reg'l*, 536 F.3d 757 (7th Cir. 2008). On remand, the district court dismissed Citadel's claim for failure to negotiate in good faith at the pleading stage and granted summary judgment in favor of Washington Regional on Citadel's claim for breach of contract (lost profits). The parties settled Citadel's claims for costs and fees incurred pre-construction. Citadel appeals the district court's dismissal and summary judgment ruling. We affirm. Citadel failed to show that Washington Regional entered into a binding agreement to complete the lease-back arrangement in the absence of executed leases. At the time the parties' relationship ended, they still had not agreed on essential lease terms, most notably, rental rates. Citadel's breach of contract claim for lost profits therefore fails as a matter of law. Citadel's claim for breach of the duty to negotiate in good faith also fails because no language in the parties' agreement required them to engage in good faith negotiations, nor did it establish a framework for the negotiation process. Absent such language, we do not infer a duty.

## I. FACTS

Washington Regional is a non-profit organization that operates medical facilities in Arkansas. Citadel is a corporation engaged in real estate development with a focus on the healthcare industry. In early 2005, Washington Regional sought to develop a medical office building through a lease-back arrangement with an outside developer. Washington Regional planned to execute a long-term ground lease on the property to the developer. The developer would then design (according to Washington Regional's specifications), finance, construct, and own the medical facility, while leasing back building space to Washington Regional. This structure allowed Washington Regional to avoid incurring substantial debt on its balance sheet. Washington Regional CEO William Bradley placed Senior Vice President Tami Hutchison in charge of the project. Hutchison issued a "Request for Proposal" to several developers, including Citadel. The request indicated that Washington Regional was interested in executing a "long-term ground lease" for the purpose of developing a 30,000 square foot medical facility. Washington Regional proposed a 30-year ground lease starting at $1,812 per month and increasing every five years.

Citadel submitted a proposal in response, whereby it would assume responsibility for the project and third-party financing of the building. *See Citadel*, 536 F.3d at 759. Citadel included a "comprehensive development proposal" with an appended "Authorization to Proceed." It noted that "[t]he Project's exact construction cost

will be driven by [Washington Regional's] specifications" and provided an anticipated interest rate and fee on the project loan. If Washington Regional chose Citadel, the letter requested Washington Regional to sign the Authorization to Proceed and return it along with the requested deposit.

Attached to the proposal letter was a three-page "Preliminary Leasing Terms Sheet." The terms sheet was prefaced by the following language:

> The following terms reflect interest rates as of May 9, 2005. This terms sheet is subject to credit review, commitments committee approval and changing market conditions among other considerations. The project costs as well as structural terms are subject to change following review of the final project design along with architect's and construction manager's final cost estimate.

The sheet stated that Project Cost was "$5,000,000 (estimated, final budget to be determined by the Hospital's facility design specifications)." It further provided that "Citadel will provide development services for a fee of 4% to be included in the Project Cost." In later correspondence, Citadel informed Washington Regional that there was no mark-up on construction costs other than the fee for project development.

The terms sheet set forth the lease term, the square feet of leased space, the tenant improvement allowance, and a variable and fixed lease rate for a primary care practice, ambulatory surgery center, and medical office space. Citadel proposed the following fixed term lease

rates: $11.20 per square foot for the primary care practice, $18.27 per square foot for the ambulatory surgery center, and fair market value for the medical office space. Citadel noted flexibility with respect to the ground lease term, suggesting a 60-year term, with two 10-year extension options and a fair market lease rate, as reasonably determined by Washington Regional.

Washington Regional subsequently requested additional information about Citadel's proposal, asking Citadel to make various assumptions. Citadel provided a detailed development budget of $6,200,000 with developer's fees of $248,000 (4 percent) in response. Citadel CEO and President David Varwig testified that he informed Washington Regional that the Preliminary Terms Sheet set forth an economic formula for determining lease rates so that Washington Regional had flexibility in deciding the type of building it wanted. (Citadel described this as a "build-to-suit" lease-back arrangement.) The formula: Total project cost x the capitalization rate (8.84 percent) ÷ total square feet = average rent per square foot.

Under this formula, the building lease rates fluctuated depending on the project costs, which were dependent in large part on Washington Regional's chosen building specifications (including size and interior layout). Varwig also testified that a "whole host of things" could cause the total project cost to fluctuate, including cost of raw materials, cost of labor, financing fees, interests rates, etc. But the formula cannot be found anywhere in the Preliminary Terms Sheet or any other document exchanged between the parties. According to Varwig, he

informed Washington Regional that "when you go to the closing you'll be able to look at the lease and look back here and mathematically tie it together." Hutchison testified that she understood that the higher the cost of construction, the higher the lease rates.

Bradley presented Citadel's and another developer's proposal to Washington Regional's board members in July. Citadel's budget presented to the board reflects the increased cost of $6,200,000 and corresponding revised building rental rates. It is not clear how Washington Regional obtained the corresponding higher rental rates. Bradley recommended Citadel's proposal and the Board approved moving forward on the project with Citadel, authorizing payment of the $60,000 deposit. Around this time, Citadel sent Hutchison a further revised budget showing a total project cost of $8.5 million.

The following month, Citadel presented Washington Regional with a letter identified as its "comprehensive development proposal." This second letter was similar to Citadel's initial proposal in all material respects, except that it added the last sentence to the following appended "Authorization to Proceed":

> [Washington Regional ] authorizes Citadel . . . to proceed with Project development at a fee of four percent (4%) of project costs according to the following schedule: (i) a 1% good faith deposit upon execution of this proposal, and (ii) the balance from Project funding. [Washington Regional] is responsible for all legal expenses and other costs associated with Project development, except

architectural and engineering fees, whether or not the project is ultimately developed. Project costs and expenses may be included in the Project's budget and hence, refunded to [Washington Regional] at Project funding. *[Washington Regional] will only be responsible for architectural and engineering fees in the event [Washington Regional] does not execute its space leases and ground lease.*

(emphasis added). Bradley, on behalf of Washington Regional, signed the Authorization to Proceed in September and informed the Washington Regional board members that Citadel "is moving forward and construction should begin in March or April 2006."

Citadel began working on the project. It hired attorneys, architects, engineers, refined building plans, engaged in zoning review, and began the process of securing financing. All the while, the parties continued to negotiate lease terms. In March 2006, Adam Lynch from Citadel sent Hutchison an email attaching "a preliminary calculation for [the building's] lease rates." The email included a document with a summary of costs for the project of $10.8 million and higher lease rates (e.g., the primary care space had a revised fixed rate of $28 per square foot). The document compared the original lease rates with the new lease rates; Lynch explained to Hutchison that it was a "proportional change." Citadel included a formula explaining how the new lease rates were calculated as the product of cost per square foot ÷ original cost per square foot x original average lease rate. After receiving this email, Hutchison

responded to Lynch saying, "Wow, this is a big difference. We need to discuss."

An email from Lynch the following month stated that Citadel was refining the project budget and expected it to be lower given certain cost revisions. Lynch also explained that the final set of drawings had been circulated and that "the construction costs will be finalized in the near future." Hutchison responded, referencing Citadel's proposal of a $30 per square foot rate in its draft lease: "[W]e [Washington Regional] have to have a lease rate that is fair market value, or we aren't going to give you the support you'll need in order to close by May 15th. We'll need to be assured that the $30/s[quare] f[oot] that is illustrated in the draft lease can be reduced by about 25% in order for this to get back into a comfort zone for us." Hutchison testified that a fair market value lease rate would be between $22 and $25 per square foot.

On May 4, 2006, Hutchison sent Lynch an email expressing serious concern over the projected costs of construction and explaining that "the overall project cost remains higher than it should be compared to other projects we have going on." Hutchison informed Lynch that Washington Regional was considering the cost of terminating their relationship. Hutchison sent Varwig a letter the next day seeking additional documentation itemizing project costs because there was concern "that the preliminary costs that Citadel has presented reflect a total project cost that is not competitive with the market. As the Board may determine not to proceed with the

Project based on current cost projections we would direct Citadel not to incur any further costs . . . ." Hutchison also requested an estimate of actual costs incurred to date on the project. Varwig responded that Citadel had incurred $722,200 in costs. Subsequently, on May 10, Lynch sent Hutchison the requested budget that presented two options based on different tenant improvement options. The first option showed a total budget of $7,117,400, a lease rate of $19.70 per square foot, and a tenant improvement allowance of $40 per square foot. The second option showed a total budget of $8,547,500, a lease rate of $23.66 per square foot, and a tenant improvement allowance of $74.85.

At Washington Regional's May 16, 2006 board meeting, Hutchison and Washington Regional's Chief Financial Officer, Dan Eckels, made a presentation comparing the second option outlined in Citadel's May 10th budget to the cost of developing the medical office building without an outside developer. The comparison showed that the board could save $2,466,000 by completing the project internally. The minutes further stated that "Hutchison advised that were the Board to decide to pursue development . . . on its own, [Washington Regional] would have to negotiate separation costs with [Citadel] . . . ." Washington Regional decided it no longer needed to use a third-party developer; its concern about debt on its balance sheet had dissipated. Hutchison recommended that Washington Regional complete construction without Citadel; the Board agreed. Washington Regional informed Citadel that it was terminating their relationship. At the time, Citadel

had completed the development stage of the project and was preparing to commence construction.

The parties could not agree on "separation costs." Citadel was seeking all of its costs, and Washington Regional asserted that it was only obligated to pay certain reasonable costs and fees. Washington Regional also refused to pay these expenses unless it received "deliverables" from Citadel, specifically the architectural, engineering, and construction plans for the building. Citadel filed suit. Washington Regional then entered into contracts with the architect and engineer Citadel had retained for the project. Washington Regional paid them to release their claims against Citadel, used their plans, and built the medical facility.

## II. ANALYSIS

Citadel originally filed suit in state court for breach of contract seeking costs incurred in the pre-construction phase of the project. After Washington Regional removed the case to federal court under diversity jurisdiction, Citadel amended its complaint to assert additional claims, only two of which are at issue here: breach of contract for lost profits (Count II) and breach of the duty to negotiate in good faith (Count III). The district court granted Washington Regional's request for dismissal of Count III and later granted summary judgment in favor of Washington Regional on Count II.

## A. Breach of Contract (Count II)

The district court granted Washington Regional's motion for summary judgment on Count II after concluding that the parties did not enter into a binding contract to complete the proposed lease-back arrangement and instead, were still negotiating key terms. The district court reasoned that the scope of the Authorization to Proceed addressed only the initial development stage of the project and contemplated the execution of ground and space leases before construction could begin. Because those leases were never executed, the court found no contract.

Our review is de novo. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe all facts and reasonable inferences in the light most favorable to the non-moving party. *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). When the material facts are not in dispute, the existence and interpretation of a contract are questions of law that the court may decide on a motion for summary judgment. *See Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099, 1102 (7th Cir. 1997); *cf. Winforge, Inc. v. Coachmen Indust., Inc.*, No. 10-3178, 2012 WL 3064726, *9 (7th Cir. July 30, 2012) (appellate review after bench trial where facts are disputed is for clear error). Even when a contract is ambiguous, as long as the extrinsic evidence bearing on the interpretation is undisputed and leads to

only one reasonable interpretation, we can decide the matter on summary judgment. *See Cont'l Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).

Washington Regional concedes that it entered into a legally enforceable contract with Citadel when signing the Authorization to Proceed. The question on appeal is the scope of the parties' agreement. The Authorization, which expressly allowed Citadel to begin project development, acknowledged that the parties still needed to execute space and ground leases. Washington Regional was responsible for all legal expenses and other costs associated with project development "whether or not the project [was] ultimately developed," and was responsible for architectural and engineering fees "in the event [Washington Regional] does not execute its space leases and ground lease." Citadel received a $60,000 good faith deposit to begin project development with the balance due from project funding at closing, which never occurred. The parties settled Citadel's claim for pre-construction costs and fees; Citadel now seeks the lost profits it would have enjoyed had it completed the project and leased the building back to Washington Regional. Both parties apply Illinois law, and thus, so do we.[1]

---

[1] We "do not worry about conflict of laws unless the parties disagree on which state's law applies." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (quotations omitted); *see also United States v. Kashamu*, 656 F.3d 679, 685 (7th Cir. 2011). Further, "when neither party raises a

(continued...)

A "preliminary writing that reflects a tentative agreement contingent upon the successful completion of negotiations that are ongoing, does not amount to a contract that binds the parties." *Ocean Atl. Dev. Corp. v. Aurora Christian Schs., Inc.*, 322 F.3d 983, 995-96 (7th Cir. 2002) (Illinois law). Although Citadel is correct that the Authorization does not expressly state that the parties' agreement was subject to a more definitive document, magic words are not required. "[T]he parties need not recite a formula to demonstrate that a definitive agreement lies in the future. Words expressing contingency or dependence on a subsequent event or agreed-on element will do." *PFT Roberson, Inc. v. Volvo Trucks N.A., Inc.*, 420 F.3d 728, 732 (7th Cir. 2005) (Illinois law); *see also Ocean Atl.*, 322 F.3d at 999 (stating that the absence of a "subject to" clause does not "carry talismanic significance").

As we have said, "[i]f the parties' written words do not show a clear intent be bound, then they will not be held to a preliminary agreement." *Ocean Atl.*, 322 F.3d at 996 (quotations omitted); *see id.* at 997 & 1002 (holding that the offer letter accepted by the defendant setting forth "some of the parameters" for the sale—perhaps even the most important terms—was not binding where the

---

[1] (...continued)

conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits." *R.E. Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991).

parties structured each of the transactions in such a way that preparation and execution of a more comprehensive contract was a prerequisite to the deal). "Illinois permits parties to . . . reach[ ] agreement in stages without taking the risk that courts will enforce a partial bargain that one side or the other would have rejected as incomplete." *PFT Roberson*, 420 F.3d at 731. "[T]he omission of crucial terms is powerful evidence that no contract was intended." *See Haslund v. Simon Prop. Grp., Inc.*, 378 F.3d 653, 655 (7th Cir. 2004) (Illinois law).

We acknowledge that just because "a formal written document is anticipated does not preclude enforcement of a specific preliminary promise." *Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992). "The fact that parties contemplate that a formal agreement will eventually be executed does not necessarily render prior agreements mere negotiations, where . . . the ultimate contract will be substantially based upon the same terms as the previous document." *Quake Constr., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 993 (Ill. 1990) (quotations omitted).

"Under Illinois law, courts focus on the parties' intentions to determine whether an enforceable contract comes into being during the course of negotiations, or whether some type of formalization of the agreement is required before it becomes binding." *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Grp., Inc.*, 873 F.2d 155, 157 (7th Cir. 1989). We consider, among other things, the complexity of the agreement, the amount of money involved, whether the agreement requires a formal writing for full expression of its terms, and

whether the negotiations indicate that a formal written document is contemplated. *See Quake Const.*, 565 N.E.2d at 994. Importantly, the intent to be bound is "measured objectively, by the parties' words and conduct," not their stated subjective intent as to the meaning of the agreement. *Block v. Magura*, 949 N.E.2d 1261, 1267 n.2 (Ill. App. Ct. 2011); *see also Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989) (Illinois law).[2]

Parties in Illinois can reach agreement in phases—and here, Citadel and Washington Regional entered into a contract only as to pre-construction development. The Authorization set the stage for further negotiations on lease terms necessary for completion of the lease-back arrangement; the parties' lack of agreement on those terms constituted a failure of negotiation, not performance. The evidence in the record simply does not support a finding that Washington Regional intended to be bound to complete the project with Citadel before the material terms of the leases had been hammered out and the leases executed. *See Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 388 (7th Cir. 1999) (Illinois law) (finding that agreement on general terms requiring

---

[2] Neither party addresses Illinois' parol evidence rule and both rely on extrinsic evidence in support of their arguments. *See CFC Inv., LLC v. McLean*, 900 N.E.2d 716, 722-23 (Ill. App. Ct. 2008) (explaining the rule). We do not need to delve into the implications of the parol evidence rule here because even considering the extrinsic evidence, Citadel cannot show that the parties entered into a binding agreement for completion of the project.

future negotiation to hammer out more specific terms did not constitute a binding contract).

A contract requires mutual assent (determined by the parities' objective conduct) as to all material terms. *See id.* at 387; *see also Nat'l Prod. Workers Union Ins. Trust v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011) (Illinois law). Indefiniteness of a material term renders a contract unenforceable when the court cannot reasonably supply the missing term through contraction interpretation, for example, by referencing an agreed upon formula. *See ATA Airlines, Inc. v. Fed. Exp. Corp.*, 665 F.3d 882, 886-87 (7th Cir. 2011), *pet. cert. filed* 80 U.S.L.W. 3669 (U.S. May 22, 2012) (No. 11-1416); *see also Haslund*, 378 F.3d at 654. "A contract may be enforced even though some contract terms [are] missing or left to be agreed upon, but if essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Milex Prods., Inc. v. Alra Lab., Inc.*, 603 N.E.2d 1226, 1233 (Ill. App. Ct. 1992). To enter into a valid lease under Illinois law, parties must agree (at a minimum) to the space, term, rent amount, and time and manner of payment. *See Millennium Park Joint Venture, LLC v. Houlihan*, 948 N.E.2d 1, 19 (Ill. 2010).

Citadel argues that the parties agreed on the essential terms through the Preliminary Leasing Terms Sheet. Both parties, however, readily acknowledge that the lease sheet provided only estimates. For example, the building lease rates were based on an estimated construction cost that the parties assumed would fluctuate depending, among other things, on the building layout

chosen by Washington Regional. Thus, the *Preliminary Terms Sheet* was exactly that: preliminary. It expressly states that it is subject to change following review of the final project design along with the final cost estimate. Citadel argues this statement meant subject to change for financing contingencies, but nothing limits the language to financing contingencies. Instead, the terms sheet states that it is subject to "changing market conditions *among other considerations.*" (emphasis added). "The parties decide for themselves whether preliminary negotiations will bind them, and they do so through their words." *Abbott Labs.*, 164 F.3d at 388.

Citadel argues that through the terms sheet and subsequent negotiations, Washington Regional agreed to a formula for calculating rental rates which gave Washington Regional flexibility in choosing the building it wanted. The formula, however, is not set forth in any document exchanged between the parties. As the district court stated, if the parties' agreement centered around this formula, its omission from the comprehensive proposal, terms sheet, and any other written document, including correspondence between the parties, is glaring. *See* 784 F. Supp. 2d 949, 962 (N.D. Ill. 2011). The facts taken in favor of Citadel may reasonably support a finding that Washington Regional was aware of the formula (or at least the relationship between costs and lease rates), but awareness does not equate with agreement. No evidence supports a finding that Washington Regional agreed to be bound by any rental rate (no matter how high) the formula generated. The major input into Citadel's formula—construction

costs—was constantly fluctuating, dependent on numerous variables (some of which were beyond the control of either party), and not constrained by any defined bounds. *Cf. Sonnenblick-Goldman Corp. v. Murphy,* 420 F.2d 1169, 1173 (7th Cir. 1970) (finding binding contract even though the amount of reserves was left to the discretion of the lender where the contract expressly required a *"reasonable* reserve").

The initial estimated project cost of $5 million was revised to $6.2 million before Washington Regional signed the Authorization to Proceed. At this point, the evidence shows that the parties anticipated entering subsequent leases for the construction phase and Washington Regional was nothing less than optimistic about the parties' long-term relationship. As Washington Regional's specifications and Citadel's cost estimates changed, though, so did Washington Regional's desire to use Citadel as the project developer. Citadel revised the estimate upward to $8.5 million, then to $10.8 million, and finally back down to $7.1/$8.5 million during the parties' negotiations. Given the unsettled material terms of the parties' agreement, we agree with the district court that Washington Regional was not "assenting to whatever output the formula generated when the key input, total project cost, was so obviously in flux." 784 F. Supp. 2d at 962.

This is further evident from the parties' continuing negotiations. When Citadel presented the $10.8 million cost estimate with correspondingly higher building rental rates, Washington Regional responded: "Wow, this

is a big difference. We need to discuss." In response to Citadel's proposed rental rate of $30 per square foot, Washington Regional stated that the lease rate had to be fair market value and thus, reduced by about 25 percent. After Washington Regional informed Citadel that it was considering the cost of terminating the relationship, Citadel proposed rates that were more aligned with fair market value. Washington Regional did not accept Citadel's proposal.

To be sure, Citadel's proposed terms may have constituted a definite offer. As Citadel explains, Washington Regional used those terms to compare the cost of developing the medical office building internally versus with Citadel. What Citadel fails to realize, though, is that Washington Regional's use of Citadel's figures does not mean that Washington Regional accepted Citadel's offer. Quite the opposite, Washington Regional rejected that offer after comparing the costs.

Citadel's contention that the parties intended to enter into a complex multi-million dollar construction project and long-term lease-back arrangement without first signing leases with set price terms and instead, based on a formula that was subject to a myriad of contingencies and not set forth in the parties' written exchanges, simply defies logic. *See PFT Roberson*, 420 F.3d at 730 (stating that one of the parties "wanted a complete and formal arrangement before being bound," and that "[s]uch caution is to be expected in a multi-million-dollar deal that would last for many years."). Citadel relies on our decision in *Dawson*, 977 F.2d at 374, to

support its position but that case is readily distinguishable. In *Dawson*, franchisor General Motors led franchisee Dawson to believe that it would not raise rent above a certain set amount and Dawson relied on this "assurance." *Id.* at 371. We held that when "[p]laced in the context of the prior dealings and discussions between" the parties, whether GM offered to cap lease rates was ambiguous. *Id.* at 373. We also explained that "one party's acquiescence in the other's reliance on the preliminary agreement is a factor that supports enforcement." *Id.* at 374.

Unlike in *Dawson*, Citadel and Washington Regional did not have a preexisting relationship and the parties were in constant negotiations over building rental rates. Citadel had not yet begun the construction phase of the project when Washington Regional terminated their relationship. We are therefore not presented with a situation where Citadel proposed rental rates and Washington Regional acquiesced in Citadel's reliance on those rates. Further, the lease rate cap in *Dawson* was a fixed mechanical figure, whereas Citadel's purported formula relied on cost of construction that was subject to numerous fluctuating variables. At no point did Washington Regional agree to pay whatever figures were generated from this inconspicuous formula. In fact, Washington Regional objected when the estimated rental rates continued to rise significantly.

The Authorization to Proceed and the parties' subsequent dealings evidence Washington Mutual's intent to use Citadel to construct the building only after the parties agreed on rental rates and executed ground and

space leases. *See, e.g., Winforge, Inc.,* 2012 WL 3064726, at *11 (Virginia law) (evidence that parties continued to negotiate scope of work after signing preliminary agreement supported finding that no contract existed). Although the parties negotiated lease terms, those negotiations proved unfruitful. It is not our function to step in as a negotiating party and fill in material terms that the parties could not agree on. *See Haslund,* 378 F.3d at 655 ("[I]f the choice of price could be delegated to a court it would be the court and not the parties that was the contract maker."); *ATA Airlines,* 665 F.3d at 886-87 ("Courts interpret and enforce contracts; they don't make contracts."). Citadel's breach of contract claim for lost profits therefore fails.

## B. Breach of Duty to Negotiate in Good Faith (Count III)

Citadel alleged in Count III that Washington Regional breached the covenant of good faith and fair dealing by not negotiating the ultimate leases for the project in good faith. Washington Regional moved to dismiss Count III because the covenant of good faith and fair dealing is not an independent cause of action under Illinois law separate from breach of contract. *See APS Sports Collectibles, Inc. v. Sports Time, Inc.,* 299 F.3d 624, 628 (7th Cir. 2002). The district court, however, construed the complaint liberally to include a claim for the breach of duty to negotiate, which Illinois does recognize as an independent cause of action. *See A/S Apothekernes Laboratorium,* 873 F.2d at 158 & 159 n.2. The district

court nevertheless found that Citadel failed to state a claim under Rule 12(b)(6) because Citadel could not point to any language in the Authorization that limited the parties' behavior while negotiating the leases.

We review dismissals under Rule 12(b)(6) de novo. *See Santana v. Cook Cnty. Bd. of Review*, 679 F.3d 614 (7th Cir. 2012). We construe the amended complaint in the light most favorable to Citadel, accept Citadel's well-pleaded facts as true, and draw all reasonable inferences in Citadel's favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must contain enough facts to state a claim for relief that is plausible on its face. *See id.* In deciding a motion to dismiss for failure to state a claim we may consider documents attached to or referenced in the pleading if they are central to the claim. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

An agreement to negotiate in good faith is a contract. *See Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 96 F.3d 275, 278 (7th Cir. 1996) ("[A]greements to negotiate toward the formation of a contract are themselves enforceable as contracts if the parties intended to be legally bound."). This duty prevents a party "from renouncing the deal, abandoning the negotiations or insisting on conditions that do not conform to the preliminary agreement." *Milex Prods.*, 603 N.E.2d at 1234. For example, "a party might breach its obligation to bargain in good faith by unreasonably insisting on a condition outside of the scope of the parties' preliminary agreement, especially where such insistence is a thinly disguised pretext for

scotching the deal because of an unfavorable change in market conditions." *Id.*

Unlike the duty of good faith imposed on parties in contract performance, there is no inherent duty of good faith with respect to contract formation. Whether a party has agreed to negotiate in good faith and the scope of that duty are determined by the terms or framework established in the parties' preliminary agreement. *Id.*; *see also A/S Apothekernes*, 873 F.2d at 159 (stating that in the absence of any agreed upon terms or even a general framework within which to conduct the negotiations, parties are free to insist on or reject any proposed terms that they wish). Language in the relevant document must indicate that good faith negotiations were contemplated, *see Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1223 (7th Cir. 1988); we should not read into the agreement terms that do not exist, *see A/S Apothekernes*, 873 F.2d at 159 n.2.

A duty may be based on explicit language, *see Venture Assocs.*, 96 F.3d at 277, and language that is less so, *see Milex*, 603 N.E.2d at 1233 (the agreement stated that the defendant would "have the exclusive right to manufacture [a] product for [plaintiff] (*at a negotiated price*) . . ." (emphasis added)); *see also A/S Apothekernes*, 873 F.2d at 156, 158 (finding a duty where the parties signed a letter of intent setting forth some terms and agreeing to negotiate exclusively for a period of time to hammer out the remaining terms and consummate an agreement). The Authorization could have been structured to require good faith negotiations or an established frame-

work for the negotiation process, but it did not. Instead, it expressly contemplated that the parties may not complete the deal and provided Citadel with a remedy if Washington Regional failed to execute the leases. This language did not bind Washington Regional to good faith negotiations; what it did was provide Washington Regional with an out. Washington Regional was free to end the negotiations when the deal became disadvantageous as long as it paid Citadel the architectural and engineering fees incurred (and possibly surrendered the $60,000 "good faith deposit"). *Cf. Milex,* 603 N.E.2d at 1233 (finding a valid contract where evidence showed that the parties intended to contract in the absence of a settled price).

"In a business transaction both sides presumably try to get the best of the deal." *Feldman,* 850 F.2d at 1223. In the absence of contract terms limiting the ability to act with self-interest, a party is not prohibited from bargaining to its own economic advantage. *See Milex Prods.,* 603 N.E.2d at 1234-35. The parties here negotiated and were optimistic that they could reach an agreement, but Washington Regional never promised that the negotiations would ultimately be successful. *See id.* It negotiated with Citadel, but when Citadel's proposed rental rates increased significantly at a time when Washington Regional was no longer concerned with carrying debt on its balance sheet, Washington Regional chose to back out of the negotiations. Nothing prohibited Washington Regional from so acting in its business interest.

### III. CONCLUSION

For the reasons stated, we AFFIRM the district court's judgment in favor of Washington Regional and against Citadel on Counts II and III of its amended complaint.