2025 IL App (1st) 242043-U
Order filed: September 24, 2025

FIRST DISTRICT
THIRD DIVISION

No. 1-24-2043

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| MICHIGAN 180 LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 21 L 10243 |
| | ) | |
| TRAFFIC TECH, INC., | ) | Honorable |
| | ) | Daniel J. Kubasiak, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Martin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We reversed the judgment in favor of plaintiff on its breach of contract claim, holding that the parties never entered into a binding contract because they never agreed on certain material terms. We entered judgment in favor of defendant.

¶ 2    Plaintiff, Michigan 180 LLC, filed a breach of contract action against defendant, Traffic Tech, Inc., alleging that the parties entered into a contract whereby plaintiff would build out office space in the building at 180 North Michigan Avenue (Building) and then lease that space to defendant for a five-year term. Defendant subsequently determined that the agreement was null and void and never moved into the office space or paid rent thereon. Plaintiff sought damages for unpaid rent, real estate taxes, operating expenses, and mitigation costs. Following a bench trial, the court entered judgment in favor of plaintiff and awarded it $593,893.06 in damages. Defendant

appeals, arguing that the parties never entered into a binding contract obligating it to lease the office space in the Building. We reverse the judgment for plaintiff and enter judgment for defendant.

¶ 3      In its amended complaint for breach of contract, plaintiff alleged that it was the owner of the Building and that on December 22, 2010, the parties entered into a lease for defendant to rent office space on the 12th floor. Defendant moved into the 12th-floor offices. On December 18, 2014, the parties entered into a fourth amendment to the lease (Fourth Amendment), which stated that plaintiff would build out office space on the seventh floor (Suite 700) at a cost of $39,900 "in substantial conformity with a Space Plan to be mutually approved by Landlord and Tenant." Any extra buildout costs in excess of $39,900 would be borne by defendant. After the buildout, defendant would relocate and rent the office space in Suite 700 on or about February 1, 2015, for a term ending on January 31, 2021.

¶ 4      The Fourth Amendment further stated that plaintiff also would build out office space on the eighth floor (Suite 800) at a cost of $81,970 "in substantial conformity with a Space Plan to be mutually approved by Landlord and Tenant." Any extra buildout costs in excess of $81,970 would be borne by defendant. After the buildout, defendant would rent the office space in Suite 800 (in addition to Suite 700) on February 1, 2016, for a five-year term ending on January 31, 2021.

¶ 5      In accordance with the Fourth Amendment, plaintiff built out the office space in Suite 700 pursuant to a mutually agreed-upon space plan and defendant relocated there. However, the parties never mutually agreed to a space plan and buildout for the office space in Suite 800 because defendant decided that Suite 800 would not provide it with enough space for its employees. Instead, defendant informed plaintiff it wanted to lease the entire eighth floor, consisting of Suites 800 *and* 810.

¶ 6    Plaintiff notified defendant that it already had a tenant in Suite 810, but that it would attempt to relocate that tenant to accommodate defendant's request for the entire eighth floor. Plaintiff warned defendant that the relocation of the other tenant could delay the move to the eighth floor until after June 2016. Defendant acquiesced in the delay "because it wanted the entire floor."

¶ 7    On January 11, 2016, plaintiff delivered a space plan for the buildout of the entire eighth floor to defendant for its approval. On February 18, 2016, defendant approved and signed off on the January 11 space plan. Plaintiff thereafter obtained construction bids from contractors. Defendant subsequently expressed unhappiness with the projected costs of the eighth-floor buildout and requested that plaintiff increase the amount of the costs which it would cover. Between August 2016 and October 2016, plaintiff repeatedly made changes to the space plan to try and reduce the costs. However, on October 27, 2016, defendant sent plaintiff a letter stating that it was ending the negotiations regarding the eighth-floor buildout, explaining:

"Pursuant to the Fourth Amendment to Lease, dated December 18, 2014, [defendant] was supposed to have taken possession of the 8th floor by February 1, 2016. Due to the buildout of the 8th floor being delayed for close to nine months, [defendant] was forced to expand in other markets outside of Chicago. Consequently, [defendant] no longer wishes to occupy the 8th floor at this time, and believes the expansion clause in the current lease to be null and void."

¶ 8    On November 7, 2016, plaintiff responded to defendant's October 27 letter, denying that it caused any delays in the buildout and stating that defendant was in breach of the Fourth Amendment, which had contractually committed defendant to leasing the office space in Suite 800 for five years.  Plaintiff notified defendant that it immediately would begin to market Suite 800 to

mitigate its damages and it ultimately was able to build out and lease Suite 800 to other tenants and receive a total of $445,729 in rent from them.

¶ 9    In its amended complaint for breach of contract, plaintiff alleged that after mitigation and application of the security deposit, defendant still owed it $473,999 in rent and it sought damages in that amount. Plaintiff also sought an award for its proportionate share of the real estate taxes and operating expenses, plus the expenses incurred in preparing Suite 800 for the mitigating tenants.

¶ 10    A bench trial was held on plaintiff's amended complaint. The evidence at trial established that plaintiff owns the Building, which is managed by Marc Realty, LLC. Defendant is a commercial entity headquartered in Chicago which moves freight for customers via multiple platforms, including railroads, ships, trucks, and airplanes. On December 22, 2010, the parties executed a lease pursuant to which defendant rented Suite 1210 of the Building. In July 2011 and February 2014, the lease was amended to allow defendant to rent Suites 1220 and 2010.

¶ 11    Defendant subsequently determined that it needed more space in the Building. In late 2014, Mark Schiele, defendant's president, spoke with Anthony Crotty, the asset manager for the Building, about moving to the seventh and eighth floors and renting Suites 700 and 800. At the time, the seventh floor needed to be built out to office specifications. The relevant space for Suite 800 was in raw condition, with no interior walls or hallways or offices, and needed to be completely built out. A second suite on the eighth floor, Suite 810, already was occupied by another tenant.

¶ 12    Crotty testified that in a typical "build-and-lease" agreement, plaintiff's design team prepares a space plan for the proposed unit, which plans out the configuration of the unit and improvements thereto pursuant to the tenant's specifications. When the tenant approves the space

plan, the design team forwards it to the project management team, which then invites contractors to bid on the project. After bids are obtained and a contractor is chosen, Crotty informs the tenant of the cost, scope and timeline for completing the project. Once the tenant gives final approval, he makes a 50% deposit and then plaintiff proceeds to construction. When construction is completed, the tenant leases the completed unit.

¶ 13 In the instant case, Crotty emailed defendant's chief financial officer, David Valela, a proposed Fourth Amendment to the lease which provided that plaintiff would build out the office space in Suites 700 and 800 "in substantial conformity with a Space Plan to be mutually approved" by plaintiff and defendant. Plaintiff would spend a specific amount for each buildout (a "landlord allowance"). The landlord allowance was $39,900 for the buildout of Suite 700 and $81,970 for the buildout of Suite 800. Any excess costs were to be borne by defendant. Upon the completion of the buildouts, defendant would lease Suite 700 beginning on February 1, 2015, and it would lease Suite 800 beginning February 1, 2016. The lease term for Suites 700 and 800 would expire on January 31, 2021. Except as so amended, the lease otherwise remained in full force and effect, including its provision that if the suites were not ready for occupancy at the commencement of the term, rent would be abated in full until they were made ready for occupancy. The Fourth Amendment further provided that "[n]o amendment, alteration or other change of this agreement shall be enforceable unless set forth in a writing signed by the parties hereto."

¶ 14 Valela signed the Fourth Amendment on December 23, 2014. With respect to Suite 700, the parties proceeded to engage in the typical build-and-lease process whereby they mutually agreed on a space plan, after which plaintiff solicited bids from contractors and defendant agreed on the cost, scope, and timeline. Defendant paid the 50% deposit, plaintiff completed the buildout and defendant moved into Suite 700.

¶ 15 The buildout and leasing of Suite 800 never occurred, though, because prior to receiving or agreeing on a space plan specific to Suite 800, defendant's president, Mark Schiele, and its vice president of sales, Murray Bannerman, began expressing interest in leasing Suite 810 in addition to Suite 800 so that defendant would have possession of the entire eighth floor. Crotty responded that plaintiff already had a tenant, Measurement Inc., in Suite 810 who would need to be relocated to accommodate defendant's request for the entire eighth floor. Measurement Inc. subsequently was relocated to another floor of the Building.

¶ 16 Plaintiff's designer, Kasia Niechcial, prepared a space plan for the eighth floor of the Building based on defendant's input and specifications, which was emailed to Bannerman on January 11, 2016. On February 18, 2016, Bannerman initialed the eighth-floor space plan, signaling defendant's approval thereof. Plaintiff solicited construction bids for the project.

¶ 17 Approximately six months later, on August 1, 2016, Crotty sent Schiele an email stating that the total costs of building out the entire eighth floor was $469,453. Crotty explained that "the scope of work planned for the 8th floor is much greater and very different than the scope of the 7th floor project and the bids have come in significantly higher." Crotty provided no breakdown of the individual costs. Schiele testified that he was shocked at the price quoted in the August 1 email, as it was double the costs of what plaintiff had paid for the seventh-floor buildout, and that he spoke with defendant's owner, Brian Arnott, about those high costs. Schiele was impeached with his deposition testimony in which he stated that the costs quoted to him in the August 1 email were not a concern to him and that he did not speak of them with Arnott.

¶ 18 In the same August 1 email, Crotty attached a proposed Fifth Amendment to the lease expressly providing for the buildout and lease of Suite 810 in addition to Suite 800 and increasing the landlord allowance to $100,470 (meaning defendant was responsible for costs exceeding that

amount). Crotty testified that the Fifth Amendment was necessary because "the Fourth Amendment didn't include [Suite] 810" and the oral agreement to build out and lease Suite 810 "is not going to be binding on the parties unless it's put in writing." However, neither Schiele nor Bannerman signed the Fifth Amendment because they never agreed on the costs for the eighth-floor buildout.

¶ 19    After receiving the August 1 cost appraisal, Schiele asked defendant's new chief operating officer, Jared Palmer, to take over the negotiations with plaintiff and Marc Realty for the buildout of the eighth floor. Schiele testified that he told Palmer to "get it done" because defendant was running out of room on the seventh floor and needed the extra space for its employees.

¶ 20    On August 10, Palmer sent an email to Crotty expressing concerns over the cost appraisal for the eighth floor, as well as the six-month delay in providing the appraisal. Palmer met with plaintiff's design team during the second week of August 2016 and then sent Crotty an email on August 22 asking for a breakdown on materials, labor and other costs and complaining again about plaintiff's delays in providing such information.  Palmer also asked Crotty to increase plaintiff's landlord allowance to cover more of the costs of the buildout. Crotty responded that he would seek a revised design plan of the eighth floor from its designer, Kasia, along with revised costs from the contractors.

¶ 21    On August 25, Kasia sent the revised design plans to Richard Krueger, a project manager and staff architect for Marc Realty, and asked him to reprice the job. On August 29, Palmer sent Crotty another email stating that he was "still waiting for a breakdown on the costs from our first meeting and the revised cost breakdown on these new plans" and that he also needed "to have the costs broken down by labor, parts/materials, permits, *etc*., specifically the lighting costs, doors, glass." Palmer stated that he had "requested this information already" and was "doing so again

now." On September 1, Crotty received the revised costs from Krueger and sent them to Schiele. Crotty informed Schiele that once defendant agreed to the costs and provided the 50% deposit, construction on the eighth-floor buildout would commence.

¶ 22    Plaintiff did not receive defendant's approval of the costs or its 50% deposit. Instead, Schiele sent Crotty an email on September 8 asking for an "update" on the eighth floor and complaining that time was wasting. Crotty sent Schiele an email the next day, September 9, explaining again that he already had sent the revised costs and that construction would begin as soon as he received the 50% deposit. Schiele testified that Crotty still was providing lump sum numbers on the total cost of the buildout and that defendant was looking for further breakdowns of individual costs.

¶ 23    On September 14, Crotty and Schiele met to try to figure out how to expedite the process. The meeting did not result in defendant's approval of the revised costs. Instead, Schiele proposed further revisions to the eighth-floor space plan. Based on the proposed revisions to the space plan, Crotty sought and received further revised costs from the contractors and relayed those costs to Palmer. On October 7, Palmer sent Crotty an email stating that the costs still were too high, that defendant's owner and chief financial officer would not "sign off" on them, and that the only way to move forward was for plaintiff to increase the landlord allowance. On October 21, Crotty sent an email refusing to increase the landlord allowance allotted in the Fourth Amendment for the buildout of Suite 800, but noting that the proposed Fifth Amendment increased the allowance for the buildout of Suite 810. On October 25, Schiele sent Crotty an email stating that defendant still was prepared to go forward with the buildout and lease of the eighth floor as soon as it received the "amended costs." Later that day, Crotty sent revised pricing on light fixtures for the eighth floor. Schiele responded with an email stating that the costs of the eighth-floor buildout still were

"significantly higher" than the costs of the seventh-floor buildout. On October 27, defendant's counsel sent a letter to Crotty stating that due to all the delays in the buildout, defendant no longer wanted to occupy the eighth floor and that it "believes the expansion clause and the current lease to be null and void."

¶ 24    During closing arguments, plaintiff argued that the Fourth Amendment was a binding and enforceable lease of Suite 800, which defendant breached when it refused to agree to the costs of the buildout and failed to take possession thereof. Defendant argued in rebuttal that plaintiff failed to perform certain conditions precedent to the leasing of Suite 800, specifically, it failed to provide a space plan for just Suite 800 and failed to complete the buildout for Suite 800 prior to the move-in date.

¶ 25    In its judgment order, the trial court agreed with plaintiff that the Fourth Amendment contained all the essential terms of a lease for Suite 800 and was contractually binding and enforceable. The court acknowledged defendant's arguments that plaintiff failed to provide a space plan for Suite 800 and failed to complete the buildout for Suite 800 by the February 1, 2016, move-in date, which were conditions precedent to defendant's performance. However, the court found that the reason plaintiff failed to provide a space plan for Suite 800 and complete the buildout by February 1, 2016, is because defendant inquired about leasing the entire eighth floor and, on its own accord, provided specifications for a space plan for a buildout of the entire eighth floor, not just Suite 800. When plaintiff solicited construction bids for the eighth-floor buildout, though, defendant repeatedly objected to the costs and insisted that plaintiff increase the landlord allowance. The court found that defendant acted in bad faith when it refused to give final approval for the buildout because plaintiff would not increase the landlord allowance. Citing *Catholic Charities of the Archdiocese of Chicago v. Thorpe*, 318 Ill. App. 3d 304, 310 (2000), which held

that a party's liability under a contract is not defeated when that party's own conduct results in the other party's failure to perform a condition precedent, the court here ruled that it would not allow defendant to take advantage of its bad-faith failure to approve of the buildout to defeat its liability under the contract. The court found in favor of plaintiff and awarded it $593,893.06 in damages. Defendant appeals.

¶ 26    Defendant argues that the trial court erred in ruling that the Fourth Amendment was a binding lease requiring it to rent Suite 800. A lease is a contract between landlord and tenant, and the rules of contract construction apply to the construction of leases. *Steenes v. MAC Property Management, LLC*, 2014 IL App (1st) 120719, ¶ 18. The issue of whether the lease/contract exists, its terms, and the parties' intent are questions of fact. *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 19; *Hedlund and Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 205 (2007).  On review of a bench trial, we will not disturb the trial court's factual findings unless they are against the manifest weight of the evidence, meaning that the opposite conclusion is apparent or the findings of fact are unreasonable, arbitrary, or not based on the evidence. *Southwest Bank of St. Louis v. Poulokefalos*, 401 Ill. App. 3d 884, 890 (2010).

¶ 27    In finding the Fourth Amendment to be a valid lease, the trial court cited in support *Chapman v. Brokaw*, 225 Ill. App. 3d 662 (1992). *Chapman* held that four elements are required for the creation of a valid lease: (1) a definite agreement describing the extent and bounds of the leased property; (2) a definite and agreed length of time for which the property is rented; (3) a definite agreement as to the amount of rent; and (4) the time and manner of payment. *Id.* at 665. The trial court found that each of those elements are present in the Fourth Amendment.

¶ 28    Defendant responds that *Chapman* is inapposite because it involved the lease of an existing house for which no renovations were required, whereas here the Fourth Amendment was not a purported lease of unaltered property but, rather, was a build-and-lease agreement requiring the buildout of the office space in Suite 800 prior to the leasing thereof. The Fourth Amendment said nothing about how the office space in Suite 800 would be configured or what it would look like after completion of the buildout, or the types of improvements to be made; it left all of these details subject to the parties' further negotiations, stating only that the buildout must be "in substantial conformity with a Space Plan to be mutually approved by Landlord and Tenant." Defendant argues that the buildout specifications missing from the Fourth Amendment are material and essential terms, without which the Fourth Amendment cannot be enforced. See *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29 (1991) (a valid contract is formed only when the offer is so definite in its material terms or requires such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain).

¶ 29    The following three cases are informative: *Intaglio Service Corp. v. J.L. Williams & Co.*, 95 Ill. App. 3d 708 (1981), *Citadel Group Ltd. v. Washington Regional Medical Center*, 692 F.3d 580 (7th Cir. 2012), and *Abbell v. United States*, 166 F. Supp. 602, 143 Ct. Cl. 556 (1958). In *Intaglio*, 95 Ill. App. 3d at 709, 710-11, the parties entered into a build-and-lease agreement whereby the defendant would design, build and lease to the plaintiff an office and brick manufacturing building containing approximately 60,000 square feet. According to the agreement, all work was to be done "in accordance with plans and specifications prepared by Thomas A. Rambert, Architect, and approved and initialed by Lessor and Lessee." *Id.* at 711. The plaintiff subsequently took possession of the building but later brought suit claiming that the building did not meet guarantees set forth in the specifications. *Id.* 713. The pertinent issue was whether the

specifications were part of the contract. *Id.* We held that since the agreement referred to the plans and specifications and required that the building be built in conformity with them, they were part of the contract. *Id.* We further held:

"[I]t is doubtful whether there was an enforceable contract until the specifications were drawn up. If a document parties agree to draft is to contain any material term that is not already agreed upon, no contract is made until that term is agreed upon; in this case the specifications constituted such a material term." *Id.* at 713-14.

¶ 30 In *Citadel Group*, 692 F. 3d at 582, the parties entered into a build-and-lease agreement whereby the plaintiff would develop, build and lease a medical office building to the defendant. The plaintiff proceeded with pre-construction project development, which contemplated the subsequent execution of ground and space leases. *Id.* at 582-83. However, the parties could not agree on essential lease terms, most notably, rental rates, and the defendant informed the plaintiff that it was terminating the agreement. *Id.* at 583-86. The plaintiff brought suit for breach of contract. *Id.* at 586. The district court granted the defendant's motion for summary judgment, finding that the parties never entered into a binding contract to complete the lease-back arrangement and instead still were negotiating key terms. *Id.* The appeals court affirmed, holding that a preliminary writing that reflects a tentative agreement contingent on the successful completion of ongoing negotiations does not amount to a binding contract. *Id.* at 587. The appeals court further held:

"The [agreement] set the stage for further negotiations on lease terms necessary for completion of the lease-back arrangement; the parties' lack of agreement on those terms constituted a failure of negotiation, not performance. The evidence in the record simply does not support a finding that [the defendant] intended to be bound to complete the project

with [the plaintiff] before the material terms of the leases had been hammered out and the leases executed." *Id.* at 588-89.

¶ 31    In *Abbell*, 166 F. Supp. at 603, the parties entered into a build-and-lease agreement whereby the plaintiffs would complete repairs and alterations to a building and then lease it to the defendant. The agreement provided that before the plaintiffs began remodeling the building, the defendant would prepare preliminary floor plans and specifications and furnish it to the plaintiffs, who would then employ an architect to prepare the final plans and specifications in accordance with the defendant's requirements. *Id.* The architect's detailed plans and specifications would be submitted to the defendant for review and final approval. *Id.* The architect's plans ultimately included three items not included in the defendant's preliminary plans, namely, a truck bay and fire alarm and sprinkler systems required by New York zoning ordinances. *Id.* at 604. The defendant failed to approve the plans drawn by the architect, contending that the plaintiffs were required under the agreement to pay for changes required by city ordinances. *Id.* at 604-05. The plaintiffs brought suit alleging that the defendant's failure to approve the architect's plans or to propose modifications that would lower the costs to its satisfaction constituted breach of contract. *Id.* at 605.  The court of claims ruled in favor of the defendant, stating:

"[H]ere the parties neither had arrived at a final agreement as to the alterations to be made nor upon terms under which the law fixed responsibility upon defendant to prevent damages to plaintiff [for] the failure of the parties to resolve the disagreement which arose. *** For defendant to refuse to go forward when the situation as it developed left so much unresolved by the negotiations was not so unreasonable as to constitute a breach of agreement on its part."  *Id.*

¶ 32    In the instant case, similar to *Intaglio*, *Citadel Group*, and *Abbell*, the parties' Fourth Amendment set forth a build-and-lease agreement for the office space in Suite 800, which agreement was not complete in and of itself but set the stage for further negotiations. Specifically, the Fourth Amendment provided that prior to the buildout, the parties must mutually agree on a space plan for the configuration of the office space and improvements thereto pursuant to defendant's specifications. *Intaglio*, *Citadel Group*, and *Abbell* make clear that a writing reflecting a tentative agreement contingent on the successful completion of ongoing negotiations as to material terms does not constitute a binding contract; no contract is made until the material terms are agreed upon. The configuration of Suite 800 and any improvements thereto are certainly material terms to the agreement, given their significance to defendant's expansion plans. See Black's Law Dictionary 991 (7th ed. 1999) (defining "material terms" as "Contractual provisions dealing with significant issues such as subject matter, price, payment terms, quantity, quality, duration, or the work to be done."). In this case, then, there was no contract until the parties could agree on the space plan for the configuration and improvements to Suite 800.

¶ 33    However, plaintiff never submitted a space plan solely for Suite 800, and the parties did not agree on one. Instead, the parties orally agreed to build out and lease the entire eighth floor instead of just Suite 800 and they subsequently prepared a space plan for the whole eighth floor, incorporating buildouts of both Suite 800 *and* Suite 810. Crotty recognized, though, that the oral agreement to build and lease the entire eighth floor effectively altered the Fourth Amendment, which did not provide for the buildout and lease of Suite 810. Section 13(c) of the Fourth Amendment states that no amendment or alteration thereto shall be enforceable unless set forth in a writing signed by the parties. Accordingly, Crotty prepared a Fifth Amendment to the lease

expressly providing for the buildout and lease of Suite 810 in addition to Suite 800. Defendant never signed the Fifth Amendment.

¶ 34    As the Fifth Amendment never was signed by defendant, the Fourth Amendment is the operative writing providing only for the buildout and lease of Suite 800, while leaving Suite 810 unaltered. As discussed, the Fourth Amendment stated that the buildout and lease of Suite 800 was contingent on further negotiations and mutual agreement as to a space plan for the configuration of the office space and any improvements. The parties never agreed on a space plan for the new configuration of Suite 800 which would have left Suite 810 unaltered as required by the Fourth Amendment, though, and thus no binding contract was made. Further, in the absence of such a space plan, no contractor submitted bids for the buildout of Suite 800 and it was not made ready for occupancy by the February 1, 2016, move-in date, thereby abating defendant's rent obligation pursuant to section 5 of the office lease, to which the Fourth Amendment was attached. Section 5 states, "In the event the Premises shall not be completed and ready for occupancy on the date fixed for the commencement of the Term *** Rent shall abate in full until the Premises are ready for occupancy." The trial court's findings to the contrary were against the manifest weight of the evidence.

¶ 35    Plaintiff argues that we should adopt the trial court's analysis and consider this case as one in which defendant's bad-faith conduct prevented plaintiff from performing a condition precedent to the parties' performance under the contract. Specifically, plaintiff argues that the contract required it to provide a space plan for Suite 800 and complete the buildout by February 1, 2016, which were conditions precedent to defendant's performance. However, defendant subsequently decided it wanted to lease the entire eighth floor and, on its own accord, provided specifications for the buildout of both Suite 800 and Suite 810 and orally agreed to extend the move-in date to

after June 2016. In accordance with defendant's specifications, plaintiff removed the tenant in Suite 810 and prepared the eighth-floor space plan, but defendant acted in bad faith by failing to give final approval to the eighth-floor buildout because plaintiff refused to increase the landlord allowance which previously had been agreed-upon. Plaintiff argues that the trial court correctly ruled that defendant cannot claim that it is relieved of its obligations under the contract due to plaintiff's failure to perform certain conditions precedent, when it was defendant's bad-faith conduct which prevented plaintiff's performance of those conditions.

¶ 36    Plaintiff's argument that defendant's bad-faith conduct prevented it from performing conditions precedent under the contract is not persuasive because, as discussed, the Fourth Amendment left certain material terms open for negotiation which were never agreed upon and thus no contract was created in the first instance. Even addressing plaintiff's claims of bad faith, our result here would be the same. In finding that defendant acted in bad faith by failing to approve the eighth-floor buildout, the trial court relied on two instances when its president, Schiele, was impeached at trial. Schiele testified that the costs of the eighth-floor buildout provided by Crotty on August 1, 2016, were concerning because they were twice the costs of the seventh-floor buildout. However, Schiele was impeached with his prior deposition testimony, in which he stated that the costs provided on August 1 were not a concern to him. Schiele also testified that he discussed the costs provided on August 1 with defendant's owner, Brian Arnott, but he again was impeached with his deposition testimony that he did not discuss those costs with Arnott.

¶ 37    Based on these "clear impeachments on a significant issue in the case," the trial court found that "Schiele's testimony lacks credibility." The court then noted that following Schiele's receipt of the August 1 email, defendant demanded that plaintiff increase the landlord allowance so as to cover more of the costs of the eighth-floor buildout. The court stated that defendant acted in bad

faith by conditioning its approval of the buildout on an increase in the landlord allowance and that defendant should not be allowed to take advantage of its bad-faith conduct to defeat its liability under the contract.

¶ 38    The trial court's finding that defendant acted in bad faith by refusing to approve the eighth-floor buildout was against the manifest weight of the evidence. As discussed, the court premised its finding of bad faith on Schiele's lack of credibility when he testified that he was concerned with the costs of the buildout. However, Schiele's testimony was not the only evidence of defendant's cost concerns. Defendant's chief operating officer, Palmer, expressed those same concerns in a series of emails contained in the record, when he objected both to the costs provided by Crotty as well as the delays in responding to his emails and stated that defendant's owner and chief financial officer also would not "sign off" on the buildout unless costs were reduced. Palmer's emails detail multiple meetings and negotiations between representatives of plaintiff and defendant over the costs of the buildout and how to reduce them, to no avail. The trial court made no finding that Palmer's emails and stated concerns about costs and delays were incredible or that the meetings and negotiations described therein were a sham. Palmer's emails were consistent with Schiele's testimony and indicate that defendant's requests to increase plaintiff's landlord allowance were in response to the higher-than-expected costs of the buildout and their inability to come to an agreement to reduce those costs. On this record, we find no bad faith on the part of defendant that would support a claim for breach of contract.

¶ 39    For all the foregoing reasons, we reverse the judgment in favor of plaintiff on its breach of contract action. Pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we enter judgment in favor of defendant. As a result of our disposition of this case, we need not address the other arguments on appeal.

¶ 40     Reversed; judgment entered.